PURE MILK PRODUCTS COOPERATIVE, and another, Respondents, v. NATIONAL FARMERS ORGANIZATION, and others, Appellants.†

Supreme Court

*No. 76–013. Argued January 29, 1979.—*
*Decided June 29, 1979.*
(Also reported in 280 N.W.2d 691.)

---

† Motion for reconsideration denied, with costs, on August 27, 1979.

For the appellants there were briefs by *Whyte & Hirschboeck, S.C.*, attorneys of Milwaukee, and *Rowley, Green, Hochberg & Fairman*, of counsel, of Washington, D.C., and oral argument by *Victor M. Harding* of Milwaukee.

For the respondents there was a brief by *St. Peter Law Offices* of Fond du Lac, and *Arent, Fox, Kintner, Plotkin & Kahn* of Washington, D.C., and oral argument by *George M. St. Peter* of Fond du Lac, and *Salvatore Romano* of Washington, D.C.

SHIRLEY S. ABRAHAMSON, J.   The circuit court enjoined the National Farmers Organization (NFO) from inducing or attempting to induce members of Pure Milk Products Cooperative (PMPC) and Associated

Milk Producers, Inc. (AMPI), dairy cooperatives, to breach or repudiate their membership and marketing agreements with PMPC and AMPI and from inducing or attempting to induce through improper means members of PMPC and AMPI to breach, repudiate or terminate their membership and marketing agreements with PMPC and AMPI. We vacate the order.

## I.

Associated Milk Producers, Inc. (AMPI), is a dairy cooperative incorporated in Kansas and licensed to do business in Wisconsin, with its principal place of business in Wisconsin located at the PMPC office in Fond du Lac. AMPI originated from consolidation of, mergers with and acquisitions of a number of dairy cooperatives in 1969. Effective May 1, 1971, AMPI and Pure Milk Products Cooperative (PMPC), a dairy cooperative incorporated in 1929 under ch. 185, Stats., with its principal place of business in Fond du Lac, Wisconsin, entered into an "Agreement and Plan of Reorganization, Consolidation, and/or Acquisition." We shall hereinafter refer to AMPI rather than to AMPI and PMPC. AMPI has a membership and marketing agreement with its producer-members by which the member agrees to sell all the dairy products he or she produces to or through AMPI.[1]

The National Farmers Organization, Inc. (NFO), is a not-for-profit corporation incorporated in Iowa. The

---

[1] This case concerns marketing agreements entered into by the Pure Milk Products Cooperative (PMPC) and those entered into by Associated Milk Producers, Inc. (AMPI). It appears that under the consolidation agreement PMPC retained some rights in its marketing agreements in effect at the time of the consolidation. The agreements and the operations of PMPC and AMPI are substantially similar, and we shall treat the two as one. We shall refer herein to AMPI, but we mean to include PMPC.

home office of the NFO is in Corning, Iowa. The NFO was formed in 1955 as a farmers' political protest group, and it first recruited Wisconsin farmers in 1961.[2] In the late 1950's and early 1960's the NFO began to recruit members in Wisconsin, employing a membership agreement which left NFO members free to market their production as they chose until such time as NFO had entered into contracts with a certain percentage of processors in a specified geographical area, which NFO has not yet done.

In 1970–1971 NFO entered into contracts with processors by which NFO agreed to supply the processors with milk. In order to obtain milk to fulfill its contracts, NFO began to operate reload stations at which milk hauled from individual milk producers was combined into larger trucks for shipment to the processors. By the summer of 1971 NFO had opened several reload stations in Wisconsin and had mounted a campaign to persuade milk producers to ship their milk to an NFO reload station. The milk of AMPI members was recruited, and numerous AMPI members signed NFO agreements and switched their milk to NFO. It is this NFO campaign to acquire milk from AMPI members which is the source of the litigation.

By means of operating reload stations and getting farmers to ship their milk through these stations, NFO hoped to gain bargaining power as the representative of NFO members in its dealings with processors. NFO also hoped to use its ability to direct the milk volume passing through the stations in such a way as to increase federally-set prices of milk to milk producers.

---

[2] Norbert Connors, Allen D. Skroch and Eralen Strey are NFO employees in Wisconsin and were named defendants in the action along with NFO. We use the term NFO to refer to all the defendants.

On August 31, 1971, AMPI filed a complaint in the circuit court for Fond du Lac County against NFO seeking temporary and permanent injunctions against specified NFO activities. On the same day AMPI obtained an *ex parte* temporary order restraining NFO from "interfering with the membership agreements between the plaintiffs and their producer-members and inducing or attempting to induce such producer-members of [AMPI] to breach, repudiate or terminate their contract with said [AMPI], either directly or by directing said producer-members of [AMPI] to locations other than those servicing said producer-members of [AMPI] or shipping to new locations operated by National Farmers Organization." A hearing on AMPI's motion for a temporary injunction was held in May, 1972. A temporary injunction, restraining NFO from the activities described in the temporary restraining order, was entered on July 10, 1973. NFO appealed to this court from the temporary injunction order. On June 28, 1974, this court in effect directed the trial court to modify the order by deleting the restraint against inducing producer-members of AMPI to terminate their membership agreements. *Pure Milk Products Cooperative v. National Farmers Organization*, 64 Wis.2d 241, 219 N.W.2d 564 (1974) (hereinafter *Pure Milk* I). Following the remand, trial was held in January and February, 1976. On June 14, 1976, the trial court issued an order which permanently enjoined NFO from inducing or attempting to induce in any manner AMPI members to breach their agreements with AMPI and enjoined NFO from using "fraudulent representations, false and disparaging statements or other improper means" to induce or attempt to induce AMPI members to breach, repudiate or terminate their agreements with AMPI. NFO appeals from this order. Further facts are presented in the opinion.

## II.

The circuit court concluded that NFO violated sec. 185.43(2), Stats., and issued an injunction pursuant to that statutory provision.[3]

Sec. 185.43(2), Stats., provides that

---

[3] The part of the order relating to the violation of sec. 185.43 (2), Stats., is as follows: "IT IS HEREBY ORDERED:

"That the defendant National Farmers Organization and defendant individuals, their agents, servants, representatives, employees and attorneys, and others acting in concert with them, be and they are hereby permanently restrained and enjoined from participating or engaging in or causing others to participate or engage in the following acts:

"1. Interfering with the Membership and Marketing Agreements between the plaintiffs* and their producer-members and inducing or attempting to induce in any manner such producer-members of plaintiffs to breach or repudiate their agreements with plaintiffs, either directly or indirectly by means of encouraging or persuading said producer-members of plaintiffs to ship their milk to locations other than those approved by plaintiffs or shipping to new or different locations owned or operated by or affiliated with the National Farmers Organization, their representatives, agents of employees, members or the individual defendants;

"2. Aiding, in any manner, in the breach or repudiation of such Membership and Marketing Agreements between plaintiffs and their producer-members;

"3. Persuading or attempting to persuade in any manner producer-members of plaintiffs to breach or repudiate their Membership and Marketing Agreements with the plaintiffs;

"4. Persuading or attempting to persuade in any manner said producer-members of plaintiffs to sell or ship their milk to plants other than at the direction of the plaintiffs, whether such other plants be owned, operated, or otherwise affiliated with the National Farmers Organization, their representatives, agents or employees, members, or the individual defendants, or any other plants or locations owned or operated by other persons or organizations."

---

\* AMPI and PMPC.

"[a]ny person, with actual or constructive notice that a contract [authorized by sec. 185.41, Stats.[4]] exists, who induces or attempts to induce any member to breach or repudiate his contract with the association, or who in any manner aids a breach of such contract, is liable to the aggrieved party for damages caused by such interference. The association is also entitled to an injunction to prevent any interference or further interference with the contract."

Under this section, a cooperative may sue for damages and obtain an injunction upon proof that it has a contract with a member or members, that the defendant has actual or constructive notice of the existence of that contract, and that the defendant has induced or attempted to induce a member to breach or repudiate[5] his contract or has in any manner aided a breach of the contract. If these elements are proved the court must grant an injunction; the court has no discretion to refuse an injunction. It is not necessary for the cooperative to prove that there is malicious intent, that the injunction is

[4] Sec. 185.41(1), Stats., provides:

"185.41 **Co-operative contracts.** (1) If otherwise lawful, contracts for any of the following purposes, whether written or contained in the bylaws, are valid when made between an association and any member in which such member agrees to:

"(a) Sell, market or deliver all or any specified part of products produced or to be produced either by him or under his control to or through the association of any facilities furnished by it.

"(b) Authorize the association or any facilities furnished by it to act for him in any manner with respect to all or any specified part of such products and any services to be furnished by him.

"(c) Buy or procure all or a specified part of goods or services from or through the association or any facilities furnished by it.

"(d) Authorize the association or any facilities furnished by it to act for him in any manner in the procurement of goods or services."

[5] We have interpreted the word "repudiate" as used in sec. 185.43(2), Stats., to mean an anticipatory breach of contract. *Pure Milk I. v. NFO*, 64 Wis.2d 241, 254, 219 N.W.2d 564 (1974).

necessary to prevent irreparable injury, or that the benefits flowing from the injunction will outweigh the harm the injunction will cause. *Neillsville Shipping Asso. v. Lastofka,* 225 Wis. 350, 353–56, 274 N.W. 280 (1937); *Pure Milk I.*

We have said that cooperative associations among farmers are favored by our laws and that sec. 185.43 (2), Stats., offers broad protection to Wisconsin cooperatives. *Northern Wisconsin Coop. Tobacco Pool v. Bekkedal,* 182 Wis. 571, 582, 197 N.W. 936 (1924); *Pure Milk I.* Chapter 185 of the Wisconsin statutes provides for the organization of cooperatives and protects them. We have said that the precursor of sec. 185.43 (2), Stats., "was enacted to meet situations which experience showed was threatening the success of such associations and to compel all outsiders to keep 'hands off' in the relations existing between the associations and their members. The sum and substance . . . is to prevent any one from buying the products of a member of such an association during the time when he is under contractual obligation to deliver his product to the association." *Watertown Milk Producers Coop. Assn. v. Van Camp Packing Co.,* 199 Wis. 379, 388, 225 N.W. 209, 226 N.W. 378 (1929).

On appeal the NFO does not deny that NFO knew of a membership and marketing agreement authorized by sec. 185.41, Stats., between AMPI and its members. NFO contends that although it successfully persuaded AMPI members to ship their milk to NFO reload stations, NFO did not violate sec. 185.43 (2), *i.e.,* NFO did not induce or attempt to induce AMPI members to breach or repudiate their agreements with AMPI or in any manner aid a breach of the agreements. NFO maintains that when AMPI members shipped their milk to NFO reload stations, the members were complying with—not breaching or repudiating—their marketing agreements. The

issue the NFO focuses upon is thus one of the construction of the marketing agreements between AMPI and its members.

The marketing agreement provides, in pertinent part,

"(2) The Association agrees:

"(a) To buy or act as the collective bargaining agent in the sale of all milk delivered to it by the Producer and pay to the Producer the amount of money it receives therefor, less authorized deductions;

"(b) To extend its general representation services to its members;

"(c) Periodically check the weights and tests of the milk delivered by the Producer to a plant where specific services are rendered by the Association;

"(d) Perform such other services as are authorized by the By-Laws and amendments thereto, all subject, however, to the limitation of the operation of the Association through its By-Laws and amendments thereto.

"...

"(4) The Producer agrees that he will sell to or through the Association all dairy products produced by or for him or under his control throughout the term of this agreement, including all extensions thereof; the Producer agrees that he will deliver such dairy products at the time and place and in the manner directed by the Association. . . ."[6]

---

[6] The PMPC agreement is quoted in the text. AMPI's marketing agreement with its members is substantially similar, providing:

"2. Member shall deliver all milk produced under his control for market: to Association or such other person at such time and place and in such form and manner as shall be designated by Association. . . .

"3. Association agrees to handle or market, and sell in its natural or processed state, all milk so produced and delivered, in such form and manner as Association deems best for the advantage of all persons signing agreements similar hereto and to blend the proceeds thereof with proceeds derived from milk delivered by other producers and establish returns therefor, in such manner as Association shall determine, giving consideration to quality, location of farm where produced and market in which the milk is sold."

The contract on its face is an exclusive marketing agreement, that is, the member-producer must sell to or through AMPI and must deliver all its milk at the direction of AMPI, and AMPI must buy or act as agent in the sale of all the milk so delivered.

Although the circuit court does not so state, it appears that it construed the agreement to mean that AMPI had total control over its members' production, so that a member could not deliver milk to a specified location without the direction of or prior approval of AMPI. This is a fair and reasonable construction of the agreement, because it is a basic concept of cooperatives that members sell their product exclusively to or through the cooperative, the theory being that united economic power achieves better prices.[7] The circuit court reasoned that because it is undisputed that NFO was soliciting milk from and was obtaining milk from AMPI's members without AMPI directing its members to ship the milk to NFO and without AMPI's approval of the shipment, NFO was interfering with AMPI's contractual rights to the milk thereby inducing a breach of the contract and AMPI is entitled to injunctive relief under sec. 185.43 (2), Stats.

The circuit court's memorandum decision, findings of fact, conclusions of law and injunction ignore and make no reference to the testimony relating to AMPI's practice of allowing its members to ship their milk to plants of their choice, apparently without obtaining AMPI's

---

[7] Evans & Stokdyk, *The Law of Agricultural Co-operative Marketing* c. IV (1937); Note, *Cooperative Marketing,* 22 Notre Dame Lawyer 413 (1947); 6A Corbin *Contracts,* sec. 1418 (1962); *Spencer Co-op. Live Stock S. Ass. v. Schultz,* 209 Wis. 344, 346, 347, 245 N.W. 99 (1932); *Northern Wis. Cooperative Tobacco Pool v. Bekkedal,* 182 Wis. 571, 582, 197 N.W. 936 (1924); *Watertown Milk Producers Coop. Assn. v. Van Camp Packing Co.,* 199 Wis. 379, 384–388, 225 N.W. 209, 226 N.W. 378 (1929).

approval and apparently without being directed by AMPI. We consider AMPI's practical construction of the agreement and its operations under the agreement of significance in determining what constitutes a breach of the agreement.[8]

Robert Beck, membership director of AMPI, and Lyman McKee, division manager for AMPI, both testified that an AMPI member could ship milk to a plant of his choice apparently without waiting for directions from AMPI and apparently without obtaining AMPI's approval; the AMPI member could ship milk to whomever he wished so long as the plant taking the milk permitted AMPI to perform its services at the plant for its members. Beck testified that the NFO reload station at Stoughton temporarily refused to allow AMPI to test its members' milk, but that at the time of trial NFO reload stations in Wisconsin permitted AMPI to perform

---

[8] "In cases so numerous as to be impossible of full citation here, the courts have held that evidence of practical interpretation and construction by the parties is admissible to aid in choosing the meaning to which legal effect will be given." 3 Corbin, *Contracts*, sec. 558, p. 249 (1960); *Jorgenson v. Northern States Power Co.*, 60 Wis.2d 29, 35, 208 N.W.2d 323 (1973).

*Cf.* sec. 402.208, Stats.:

"**Course of performance or practical construction.** (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (s. 401.205).

"(3) Subject to s. 402.209 on modification and waiver, such course of performance is relevant to show a waiver or modification of any term consistent with such course of performance."

the tests. Under the AMPI agreement, a member authorizes and directs the buyer of the milk to deduct from the purchase price for the members' milk and to pay AMPI an amount for the services provided the member by AMPI. The record shows that AMPI certified to NFO a list of its members who were shipping milk to the NFO reload station, and AMPI advised NFO of the "check-off" to be paid AMPI under the agreement. Beck complained that NFO refused to forward to AMPI the "check-off" fee from the price paid AMPI members for their milk. The refusal of all NFO reload stations to forward this fee to AMPI is, Beck stated, one cause of the dispute between AMPI and the NFO. However, Beck testified that this refusal by NFO did not constitute or imply a breach of the AMPI agreement by AMPI members shipping to NFO.[9]

Arthur Steindl, Howard Hunt, and Donald Meyer, AMPI members who notified AMPI when they decided to deliver their milk to an NFO reload station, testified that no one from AMPI challenged their right under their agreement to deliver their milk to an NFO facility.

On the basis of this testimony, we conclude that an AMPI member did not breach the agreement by delivering milk to an NFO reload station to which AMPI certi-

---

[9] Sec. 185.41(4), Stats., provides that if the membership agreement contains an assignment of funds to the association, any person who accepted or receives the product from the member is bound by such assignment after receiving written notice from the association. Sec. 185.41(4), Stats., provides:

"(4) If any contract authorized by sub. (1)(a) or (b) contains an assignment to the association of any part or all of funds due or to become due the membership during the life of the contract for any product produced or to be produced by him or for any services performed or to be performed in producing any product, any person who accepts or receives such product from the member is bound by such assignment after receiving written notice from the association or the member of the amount and duration of such assignment."

fied its members and where AMPI was permitted to provide testing and other services for its members.

AMPI's brief does not assert that NFO was receiving milk that AMPI had directed its members to deliver to some other location, that AMPI had instructed its members not to deliver to NFO, or that AMPI directed NFO not to accept milk of AMPI members. We agree with AMPI that AMPI need not sue its members to establish a breach; AMPI need only sue the third party inducing a breach. But here there is no evidence that any member was breaching the agreement. From the record it appears that a substantial percentage of the AMPI members shipped to plants of their choice rather than to plants with which AMPI contracted to supply milk. Beck testified that it was consistent with a member's agreement for a member to transfer his milk to an NFO reload station. On appeal AMPI does not contend otherwise. AMPI's brief states that "There is no inconsistency in a cooperative, such as AMPI and PMPC, permitting producer-members to ship to locations where they desire and retaining the right to direct their milk production to particular plants or locations when bargaining or marketing conditions require. . . . The evidence clearly demonstrates that a PMPC or AMPI member could continue to ship his milk to a plant of his choice so long as PMPC was able to render the testing and marketing services provided for in the contract."

In light of this record, we look in vain for an explanation of how the members breached their agreement by shipping to NFO. Nor did NFO cause AMPI to breach its agreement with its members, because AMPI performed the tests. Although AMPI would have us believe that NFO's solicitation of its members' milk is a breach, AMPI's practice and operations defeat this assertion.

We conclude on the basis of the record of this case that the delivery of milk by an AMPI member to an NFO re-

load station did not constitute a breach of that member's AMPI agreement. Therefore even if NFO induced AMPI members to deliver milk to NFO reload stations, this inducement would not constitute a breach of the agreement and could not be the basis for an injunction under sec. 185.43(2), Stats. Accordingly we vacate that portion of the circuit court's order enjoining the NFO and others from inducing or attempting to induce AMPI members to deliver their milk to an NFO facility.

## III.

We now turn to consider whether the trial court erred in enjoining NFO from purposely causing by improper means of inducement AMPI members to breach, repudiate or terminate their agreements with AMPI.

In *Pure Milk* I, 64 Wis.2d at 255, we said, and we reiterate here, that our laws favor cooperative associations and that it is the legislative intent to promote the organization and success of co-operative marketing associations. Nevertheless, we went on to note that the legislature did not intend to limit legitimate competition "by preventing anyone from encouraging or persuading a producer to terminate his association with one marketing group and to join another." Wisconsin protects legitimate competition from predatory tactics by subjecting anyone who wrongfully interferes with existing or prospective contractual relations to liability.

In *Pure Milk* I, *supra,* 64 Wis.2d at 257, 258, we said that Wisconsin has adopted the formulation of the common law tort of interference with contracts. Restatement of Torts, secs. 766 and 768.[10] We concluded that

[10] After *Pure Milk* I, Restatement of the Law (Second) 1979 was issued, with changes in ch. 37, Interference With Contract or Prospective Contractual Relation.

NFO was a competitor of AMPI and was privileged to induce AMPI members to terminate their AMPI agreements in accordance with the termination provisions thereof (and not in breach thereof) subject to the limits stated in sec. 768 of the Restatement. We said that "fraudulent misrepresentations are . . . ordinarily improper means of inducement and defeat the existence of a privilege."[11]

The circuit court found that "due to the interference activities of NFO, its officers, employees and staff, acting individually and together and in concert with others, including various NFO County organizations, and the use of fraudulent representations, misrepresentations, false and disparaging statements, large numbers of producer-members of AMPI and PMPC breached, repudiated and cancelled their membership and marketing agreements with AMPI and PMPC." In other findings the circuit court detailed the "fraudulent representations, misrepresentations, and false and disparaging statements" made by NFO officers and others as follows:

(1) that AMPI was going broke and that members of AMPI were going to be assessed;

(2) that dairy farmer Delmar Jenneman made substantially more money shipping his milk to NFO than he made shipping to AMPI;

---

[11] Because the complaint before the court in *Pure Milk* I did not allege use of improper means of inducement by NFO and there was virtually no evidence in the record suggesting that NFO had employed such means, we vacated the circuit court's temporary injunction insofar as it restrained NFO from inducing AMPI members to terminate their agreements pursuant to the terms thereof. AMPI then amended its complaint to allege that NFO used improper means, such as fraudulent misrepresentations and misleading and disparaging statements to induce AMPI members to terminate their agreements. As stated previously, the circuit court found that NFO had used such means and enjoined NFO from using them in the future.

(3) that AMPI was importing large amounts of butter and hurting farmers by doing so;

(4) that the "butter-powder formula" proposed by cooperatives, including AMPI, would cause the price of milk paid to farmers to go down by over $1.20; and

(5) that NFO has been and is the most significant or sole factor in increasing the Minnesota-Wisconsin (M-W) series price and the market price paid for milk to farmers.[12]

The circuit court found that each of these representations was false and that NFO knew or had reason to know that each was false, as intended to be understood by dairy producers in Wisconsin. The circuit court concluded that

"3. NFO and defendant individuals, their agents, servants, employees and others, acting individually and in concert with others, including various NFO County organizations, induced and attempted to induce, through the use of improper means, including fraudulent representations, misrepresentations, false and disparaging statements, the producer-members of AMPI and PMPC to breach, repudiate and cancel their membership and marketing agreements with AMPI and PMPC in violation of Wisconsin law prohibiting interference with contractual agreements.

"4. Plaintiffs have and will suffer, if NFO's unlawful activities are permitted to continue, substantial and irreparable injury in the form of the loss of large numbers of members, disruption of marketing programs, disruption of plant operation and decrease in plant efficiency due to the unlawful activities of NFO, the individual defendants, their agents, employees, servants and others

[12] The Minnesota-Wisconsin series is a series of predicted prices for manufacturing grade milk in Minnesota and Wisconsin, published monthly by the United States Department of Agriculture. The monthly predicted prices attempt to reflect accurately the competitive supply and demand conditions in the Minnesota and Wisconsin dairy industry. Federal milk and milk product minimum prices nationwide are in large part a function of the Minnesota-Wisconsin series prices.

acting individually and in concert with others, including various NFO County organizations."

The circuit court accordingly permanently enjoined NFO from using such misrepresentations and other improper means to induce AMPI members to breach, repudiate or terminate their marketing agreements.[13]

[13] "IT IS FURTHER ORDERED:

"That the defendant National Farmers Organization and defendant individuals, their agents, servants, representatives, employees and attorneys, and others acting in concert with them, be and they are hereby permanently restrained and enjoined from participating or engaging in or causing others to participate or engage in the following acts:

"1. Interfering with the Membership and Marketing Agreements between the plaintiffs and their producer-members and inducing or attempting to induce such producer-members of plaintiffs, through fraudulent representations, false and disparaging statements or other improper means, to breach, repudiate or terminate their agreements with plaintiffs, including but not limited to the following improper means:

"A. Misrepresenting the financial condition of plaintiffs to the effect that plaintiffs are going broke or related misrepresentations to the effect that plaintiffs are insolvent or on the verge of insolvency or are in an unsound financial condition.

"B. Misrepresenting the raw milk price that NFO is paying or proposes to pay to dairy producers at any time.

"C. Utilizing deceptive or misleading and false comparisons of the raw milk prices paid dairy producers by plaintiffs and defendants.

"D. Misrepresenting that defendant NFO has been or is a significant, substantial or the sole cause or factor in increasing Minnesota-Wisconsin Series prices or, misrepresenting the pay prices to dairy producers for raw milk; or misrepresenting that defendant NFO could, directly or indirectly, cause the Minnesota-Wisconsin Series price to increase.

"E. Misrepresenting that plaintiffs have imported dairy products and/or the impact of such upon the price level of raw milk, including, but not limited to, the Minnesota-Wisconsin Series Price.

"F. Misrepresenting the position taken by plaintiffs at any Federal Milk Market Order Hearing or at any adjudicative or administrative proceeding of the United States Department of

Permanent injunctions are not to be issued lightly. The cause must be substantial. *Werner v. A.L. Grootemaat & Sons, Inc.,* 80 Wis.2d 513, 520, 259 N.W.2d 310 (1977). Because an injunction is enforceable by the contempt power, it is "an extremely powerful instrument." Dobbs, *Remedies,* p. 105 (1973).

The injunction is a preventive order looking to the future conduct of the parties. To obtain an injunction, a plaintiff must show a sufficient probability that future conduct of the defendant will violate a right of and will injure the plaintiff. *The Kimberly & Clark Co. v. Hewitt,* 75 Wis. 371, 375, 44 N.W. 303 (1890). To invoke the remedy of injunction the plaintiff must moreover establish that the injury is irreparable, *i.e.* not adequately compensable in damages. *Ferguson v. Kenosha,* 5 Wis.2d 556, 561, 93 N.W.2d 460 (1958). Finally, injunctive relief is addressed to the sound discretion of the trial court; competing interests must be reconciled and the plaintiff must satisfy the trial court that on balance equity favors issuing the injunction.[14]

---

Agriculture and/or the impact of any such position upon the price level (including the M-W Series Price) of raw milk.

"2. Aiding, in any manner, in the breach, repudiation or termination of the Membership and Marketing Agreements between plaintiffs and their producer-members by fraudulent representations, false and disparaging statements or other improper means, including, but not limited to those specified in paragraphs 1 A through F above.

"3. Persuading or attempting to persuade producer-members of plaintiffs to breach, repudiate or terminate their Membership and Marketing Agreements with the plaintiffs by fraudulent representations, false and disparaging statements or other improper means, including, but not limited to those specified in paragraphs 1 A through F above."

[14] *Hartung v. Milwaukee County,* 2 Wis.2d 269, 281, 86 N.W.2d 475, 87 N.W.2d 799 (1957); *McKinnon v. Benedict,* 38 Wis.2d 607, 616, 617, 157 N.W.2d 665 (1968). *See generally,* 11 Wright & Miller, *Federal Practice and Procedure,* sec. 2942 (1973).

In view of our holding that NFO did not induce any breach of the membership agreement, we remand the cause to the circuit court to reconsider whether an injunction should issue enjoining NFO from inducing or attempting to induce members through fraudulent representations to terminate their agreements. Upon a review of the record the circuit court may conclude that there is an inadequate basis for making the determinations required, and the circuit court may reopen the case and take additional testimony, if it so elects.

The circuit court enjoined NFO from making the five representations on the ground that NFO's employment of those representations had caused breaches, repudiations and terminations of AMPI marketing agreements. We have concluded above that the record fails to show that the 1,200 AMPI members who delivered their milk to NFO breached or repudiated their marketing agreements by doing so or that NFO induced a breach of the agreements by inducing AMPI members to deliver to NFO facilities. The record shows that between 1970 and 1974 fewer than 150 AMPI members terminated their AMPI agreements while delivering their milk to NFO. Robert Beck testified that the AMPI list with the names of those terminated members was incomplete, but we can find no other evidence of terminations in the record. No evidence regarding terminating members appears in the record for the year 1975, the year before the trial in the instant case began.

The circuit court made no specific finding as to whether any of NFO's five representations caused any AMPI members to terminate or whether the termination of approximately 150 members during 1971–1974, without considering the "1,200 switching" members, constitutes a sufficient threat of irreparable injury to warrant an injunction.

To facilitate further proceedings in the circuit court, we comment on several objections NFO raises to the injunction.

NFO asserts on appeal that an injunction should not be issued because the record does not sustain the findings of the circuit court that NFO's conduct, unless enjoined, will cause AMPI substantial injury in the future. NFO argues that an injunction should not issue in the instant case unless the record establishes that in the past AMPI members have terminated in reliance upon the alleged NFO misrepresentations. We do not accept this assertion; we agree with AMPI's position that an injunction is designed to prevent injury, not to compensate for past wrongs, and that an injunction may issue merely upon proof of a sufficient threat of future irreparable injury. This court has held that to establish a sufficient probability that a defendant's conduct will injure a plaintiff it is not necessary for the plaintiff to wait until some injury has been done; equity will prevent, if possible, an injury. Threat of an injury is sufficient. *The Kimberly & Clark Co. v. Hewitt,* 75 Wis. 371, 375, 44 N.W. 303 (1890) ; *Lakeside Oil Co. v. Slutsky,* 8 Wis.2d 157, 168, 98 N.W.2d 415 (1959).

Nevertheless, in the instant case NFO conduct about which AMPI complains has persisted for several years. AMPI's theme is that since 1971 NFO has engaged in a massive campaign to induce AMPI members to terminate AMPI marketing agreements by improper means and to deliver milk to the NFO. Under these circumstances, if there is no evidence that those AMPI members who terminated their marketing agreements in fact did so in reliance upon the alleged misrepresentations, a question to be considered is whether AMPI has established that any of the representations complained of threatens irreparable injury to AMPI in the future.

A critical question for a court in deciding whether to issue a permanent injunction in view of past violations

is whether there is a reasonable likelihood that the wrong will be repeated. We recognize that evidence of fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations. It appears from the memorandum decision that the circuit court would not have issued an injunction unless all (or at least several) of the five aforementioned representations had been made and had been made on a repeated, wide-scale basis, rather than on an isolated basis. NFO asserts that there is no evidence that four of the five representations of which AMPI complains were made within a year of the trial.

NFO objects that the injunction is not limited to enjoining the five representations which the circuit court found to be fraudulent representations and false and disparaging statements or even limited to enjoining any kind of fraudulent representations and false and disparaging statements. The order enjoins NFO from employing "other improper means." The mere fact that a defendant has committed an illegal act does not justify an injunction, under penalty of contempt, which enjoins it from all unlawful practices which the court has neither "found to have been pursued nor persuasively to be related to proven unlawful conduct." *Labor Board v. Express Pub. Co.,* 312 U.S. 426, 433 (1941). The purpose of an injunction is to prevent violations, "the threat of which in the future is indicated because of the similarity or relation to those unlawful acts" which have been committed. We recognize that the breadth of the injunction depends on the circumstances of each case. A too narrow injunction contributes to evasion; a too broad injunction leaves NFO without adequate guides.

We leave the application of these principles to the sound discretion of the circuit court. Here we merely restate them, as well as reaffirm this state's strong tradi-

tion of encouraging cooperatives and discouraging unfair competition. While the competitive system encompasses the efforts of rivals to divert business from one another, the efficient operation of the system rests on the free flow of accurate information. Disseminating false information is a wrong against both the consumer and competitors.

*By the Court.*—Order vacated and cause remanded for further proceedings not inconsistent with this opinion.