# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2019AP488

†Petition for Review Filed

Complete Title of Case:

**KEMPER INDEPENDENCE INSURANCE COMPANY,**

  **PLAINTIFF-RESPONDENT,**

  **V.**

**ISMET ISLAMI,**

  **DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | May 27, 2020 |
| Submitted on Briefs: | January 22, 2020 |

| | |
|---|---|
| JUDGES: | Reilly, P.J., Gundrum and Davis, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph F. Owens* of *Law Offices of Joseph F. Owens, LLC,* and *Debra K. Reidel* of *Debra K. Reidel Law Offices*, New Berlin. |
| Respondent<br>ATTORNEYS: | On behalf of the plaintfiff-respondent, the cause was submitted on the brief of *James M. Fredericks* and *Allison E. Kliner* of *Borgelt, Powell, Peterson & Frauen, S.C.*, Milwaukee. |

# COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 27, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2019AP488**

**STATE OF WISCONSIN**

Cir. Ct. No.  2013CV2875

**IN COURT OF APPEALS**

---

KEMPER INDEPENDENCE INSURANCE COMPANY,

   PLAINTIFF-RESPONDENT,

V.

ISMET ISLAMI,

   DEFENDANT-APPELLANT.

---

APPEAL from an order of the circuit court for Waukesha County: WILLIAM DOMINA, Judge. *Affirmed*.

Before Reilly, P.J., Gundrum and Davis, JJ.

¶1    DAVIS, J.    Ismet Islami (Ismet) appeals a summary judgment order in favor of Kemper Insurance Company (Kemper) denying coverage for loss of her home stemming from a fire intentionally set by Ydbi Islami (Ydbi), from whom Ismet is legally separated.  The trial court ruled that coverage to Ismet was barred

under a "concealment or fraud" condition of her policy, which provides that "no" insured has coverage if "an" insured, whether before or after the loss, conceals or misrepresents any fact upon which the insurer relies or which contributes to the loss.

¶2      The above policy provision is in play because Ydbi, in addition to setting the fire, lied about his misdeeds in sworn post-loss statements to Kemper. Ismet, who indisputably had nothing to do with the arson or Ydbi's false denial, seeks to avoid what would otherwise be the coverage-defeating consequences of Ydbi's lies, on three grounds.  These are:  (1) WIS. STAT. § 631.95 (2017-18)[1] prevents denial of coverage to a domestic abuse victim based on acts of the abuser that cause, or instill fear of causing, physical harm to the victim; (2) because of their legal separation, Ydbi is not Ismet's "spouse," and therefore is not an "insured" to whom the "concealment or fraud" provision applies; (3) the policy is "several," so under the principles articulated in *Hedtcke v. Sentry Insurance Co.*, 109 Wis. 2d 461, 326 N.W.2d 727 (1982), Ydbi's violation of the "concealment or fraud" condition cannot be imputed to an "innocent insured" such as Ismet.  The trial court rejected these arguments and granted summary judgment in favor of Kemper.  We affirm.

## FACTUAL BACKGROUND

¶3      Ismet and Ydbi married in 1978.[2]  In 1998, Ismet obtained a legal separation from Ydbi.  *See* WIS. STAT. § 737.35.  As part of the separation, the

---

[1]  All references to the Wisconsin Statutes are to the 2017-18 version.

[2]  The facts relevant to this appeal are taken from joint stipulations and other undisputed summary judgment submissions.

2

parties entered into a Marital Settlement Agreement, in which they agreed that Ismet would have sole title to the home. Nonetheless, Ismet and Ydbi continued to live in the home together.[3]

¶4      For the one-year period beginning July 25, 2012, Kemper insured Ismet's home, as well as listed automobiles and typical homeowner liability risks, through a "Package Plus" combination home and automobile policy issued to Ismet. The policy lists Ismet as the "Named Insured" in the declarations but also states:

> Throughout the policy, "you" and "your" means the person shown as the "Named Insured" in the Declarations. It also means the spouse if a resident of the same household.

¶5      On June 10, 2013, a fire destroyed Ismet's home while she was vacationing in Europe. Kemper began an investigation to adjust the loss. Pursuant to a provision in the policy, Kemper conducted an Examination Under Oath (EUO) of both Ydbi and Ismet. Ismet and Ydbi also signed a document titled "Sworn Statement in Proof of Loss," in which they attested that the fire was of "unknown" origin. Kemper then denied coverage for the loss, citing among other reasons a

---

[3] Ismet submitted an affidavit and gave sworn testimony in an Examination Under Oath conducted by Kemper's attorney, in which she stated that she initially sought a divorce from Ydbi after his 1988 conviction for sexual assault but that he would not consent to the divorce. According to Ismet, for religious reasons this prevented her from obtaining a divorce, and she ultimately pursued the alternative path of legal separation. Since Ismet and Ydbi continued to live in the same residence, the separation may have been a financial decision (and some of Ismet's statements indicate that this was the primary consideration). Resolving the purpose behind the separation is not relevant to the issues on this appeal, however, and we express no opinion on this point.

violation of the following provision, which is set forth in the "Conditions" section of Ismet's policy:[4]

    2. Concealment or Fraud.

        a. Under Section I—Property Coverages, with respect to all "insureds" covered under this policy, we provide coverage to no "insureds" for loss under Section I—Property Coverages if, whether before or after a loss, an "insured" has:

            1)    Concealed or misrepresented any fact upon which we rely, and that concealment or misrepresentation is material and made with intent to deceive; or

            2)    Concealed or misrepresented any fact and the fact misrepresented contributes to the loss.

Kemper also sued, seeking a declaration of no coverage; Ismet counterclaimed.

¶6    A lengthy procedural path, which need not be recounted here, ensued. Both parties ultimately filed motions for summary judgment on stipulated facts. The parties agreed that Ydbi set the fire (by that point Ydbi had been criminally prosecuted for the arson). The parties further stipulated that Ydbi knowingly lied in his earlier statements as to his involvement in and knowledge of the cause of the fire, that he did so with the intent to deceive Kemper, and that Kemper relied on his concealment and fraud to its detriment. The parties also agreed that Ismet did not conspire with Ydbi, knew nothing about Ydbi's actions, and did not engage in fraud or concealment in any statements to Kemper. In three separate summary judgment

---

[4] Ismet's policy contains two "concealment or fraud" provisions, one in the main policy and the second in the Wisconsin Endorsement. The trial court determined that the provision in the Wisconsin Endorsement controls. Although Ismet notes the differences between the two provisions, claiming that Kemper "without amending its Complaint … strategically switched from reliance" from the main policy version to the version in the Wisconsin Endorsement, she develops no argument as to why the trial court might have erred in ruling that the Wisconsin Endorsement was controlling. Therefore, our decision rests only on an analysis of the "concealment or fraud" provision in the Wisconsin Endorsement, which is quoted above.

hearings, the trial court granted Kemper's motion and denied Ismet's, resulting in a declaration of no coverage and the dismissal of Ismet's claims. Ismet now appeals.

## DISCUSSION

¶7 Because this case was decided on summary judgment our goal is to ascertain whether the trial court correctly found that there was no genuine issue of material fact so as to entitle Kemper to judgment as a matter of law. *See* WIS. STAT. § 802.08(2). In conducting this inquiry we owe no deference to the trial court; although its analysis may be helpful, we apply a de novo standard of review. ***Summers v. Touchpoint Health Plan, Inc.***, 2006 WI App 217, ¶7, 296 Wis. 2d 566, 723 N.W.2d 784.

*WISCONSIN STAT. § 631.95 Does Not Apply to the Loss in Question Because There is No Evidence That the Property Damage at Issue Resulted From "Domestic Abuse," as That Term is Defined in the Relevant Statute*

¶8 Although Ismet claims that Ydbi should not be considered her "spouse," any such status is irrelevant if she is correct in her contention that WIS. STAT. § 631.95 applies to the loss in question. Consequently, we start with this issue. Broadly speaking, § 631.95 contains provisions that maintain insurance coverage that might otherwise be excluded due to the intentional act of an insured, where the loss was due to acts of abuse or domestic abuse. Property insurance policies are expressly among the types of insurance coverages falling within the scope of the statute. Specifically, § 631.95(2)(f) provides that an insurer may not

> [u]nder property insurance coverage that excludes coverage for loss or damage to property resulting from intentional acts, deny payment to an insured for a claim based on property loss or damage resulting from an act, or pattern, of abuse or domestic abuse if that insured did not cooperate in or contribute to the creation of the loss or damage and if the person who committed the act or acts that caused the loss or damage is criminally prosecuted for the act or acts.

5

As relevant here, "domestic abuse" is defined as any of four separate actions "engaged in by an adult person against his or her spouse or former spouse." WIS. STAT. §§ 631.95(1)(c), 968.075(1)(a).[5] These actions are:

> 1. Intentional infliction of physical pain, physical injury or illness.
>
> 2. Intentional impairment of physical condition.
>
> 3. A violation of [WIS. STAT. §] 940.225(1), (2) or (3).
>
> 4. A physical act that may cause the other person to fear imminent engagement in the conduct described [above].

Sec. 968.075(1)(a).[6]

¶9      The record does not support Ismet's claim that this statute applies. Nowhere in her summary judgment submissions does Ismet suggest that Ydbi has ever committed any act of physical violence or sexual assault against her, or committed any "physical act" that would reasonably cause fear of such conduct, let alone that any such act resulted in the loss in question.  Instead, Ismet claims that Ydbi's "arson, in and of itself is the egregious act of domestic abuse in this case." The relevant definitions, however, belie this contention.  The statute requires physical harm, impairment of physical condition or sexual assault, or, barring that, some "physical act" that would reasonably instill fear of one of those things.

¶10      Although it is certainly possible that arson could be tied to physical harm or a fear of harm—say, if it were committed while the arsonist believed the insured were in or near the structure—there is no evidence of that here.  In fact,

---

[5] WISCONSIN STAT. § 631.95(2)(f) applies where there is "abuse or domestic abuse." "Abuse" has "the meaning given in [WIS. STAT. §] 813.122(1)(a)." That statutory section, in turn, deals with child abuse restraining orders and injunctions and is not relevant to our analysis.

[6] WISCONSIN STAT. § 940.225 deals with various forms of sexual assault.

there is no evidence as to Ydbi's motive at all and no evidence that Ismet was ever in fear of him. There are any number of reasons why a party might commit arson. To suggest, without more, that Ydbi's arson was tied to a threat of physical harm to Ismet would require complete speculation (especially since Ismet was in Europe when the arson occurred). Ismet was required on summary judgment to present some evidence linking the arson to physical harm or, at the very least, showing that the arson reasonably led her to fear such harm. The lack of such a showing causes her argument under WIS. STAT. § 631.95(f) to fail.[7]

*Ydbi Was Ismet's "Spouse" at the Time of the Loss*

¶11    Ismet next argues that in light of her and Ydbi's legal separation, Ydbi was not her "spouse" and therefore not an "insured" under the policy, such that any concealment or fraud on his part has no bearing on her coverage. The parties have not cited, and we have not found, Wisconsin authority on the question of whether parties who are legally separated are considered "spouses" under an insurance policy—or, for that matter, under any other contract employing that term. Wisconsin law, however, does consider a legal separation as something less than terminating a marriage. *Compare* WIS. STAT. § 767.35(1)(b)1., *with* § 767.35(1)(b)2.; *see also* § 767.35(3)-(5). Parties to a legal separation cannot remarry and can reconcile without having to get remarried. Sec. 767.35(4). As our supreme court has noted, "there are more rights and obligations remaining in the marriage after a legal separation than following an absolute divorce." **Herbst v. Hansen**, 46 Wis. 2d 697, 706, 176 N.W.2d 380 (1970).

---

[7] Because we find that WIS. STAT. § 631.95 does not apply to the loss in question, we need not consider whether the statute would excuse an abuser's violation of the "concealment or fraud" provision, which of course was the basis for denying coverage in this case.

¶12    Ultimately, however, we do not base our decision on this fine point of Wisconsin family law. Rather, like the trial court, we view this as a matter of contract interpretation, since it is an insurance policy that uses the term "spouse." Our role is to determine the meaning of this contractual term and the intent of the parties as objectively manifested. *See Langer v. Stegerwald Lumber Co.*, 262 Wis. 383, 388, 55 N.W.2d 389 (1952) ("It has been affirmed over and over again that secret intentions of the parties to a contract are wholly immaterial. It is not what the parties secretly intended, but it is what they manifested to each other by words or conduct that determines their rights." (citation omitted)).

¶13    In this case the contract—the insurance policy at issue—expressly characterizes Ydbi as Ismet's spouse, and in fact his vehicle was named in the declarations as a covered automobile. This is not at all surprising, since Ydbi continued to live in the household. Ismet suggests that Ydbi's status was simply a label unilaterally placed in the policy by Kemper, but she produces no evidence, such as her application or other correspondence, to support her tacit suggestion that we should reform the policy to alter its otherwise clear import:  that Ydbi was intended to be an "insured." To the contrary, both Ismet and Ydbi signed the Sworn Statement in Proof of Loss, which was submitted to Kemper and which identified each of them as an "Insured." It is well settled that such "course of performance" evidence is relevant to contract construction. *See Pure Milk Prods. Co-op v. National Farmers Org.*, 90 Wis. 2d 781, 793 n.8, 280 N.W.2d 691 (1979) ("In cases so numerous as to be impossible of full citation here, the courts have held that evidence of practical interpretation and construction by the parties is admissible to aid in choosing the meaning to which legal effect will be given." (citation omitted)). Indeed, in other contexts the status of a legally separated party as an insured spouse works to the insurer's detriment (and to the benefit of insureds)—here, for example,

there can be little doubt that Ydbi generally was covered under the policy for liability risks. The trial court did not err in finding that Ydbi was a "spouse" and therefore an "insured" under the policy.

*The Policy's "Concealment or Fraud" Provision is "Joint," Not "Several," and Therefore Applies To "Innocent Co-Insureds"*

¶14    Ismet's final argument is that Ydbi's conceded violation of the "concealment or fraud" provision should not be imputed to her. She claims that to do so would violate the public policy rationale of ***Hedtcke***, 109 Wis. 2d 461. She further claims that such a result is warranted by the policy language. We disagree.

¶15    We begin with a discussion of ***Hedtcke***. In that case, Judith Hedtcke and her estranged husband were named insureds under a property policy covering a home they jointly owned. ***Id.*** at 479-81. Her husband intentionally set fire to the home. ***Id.*** at 480-81. Hedtcke sought coverage despite a provision of the policy barring coverage "if [the loss] was 'caused, directly or indirectly, by … neglect of the insured to use all reasonable means to save and preserve the property at and after a loss' or if 'the hazard is increased by any means within the control or knowledge of the insured.'" ***Id.*** at 480 (footnote omitted). Our supreme court noted that prior Wisconsin case law had denied recovery to "innocent co-insureds" in this scenario; the court also noted, however, that the "modern rule" was to allow for recovery. ***Id.*** at 479, 485. Important to our analysis is the fact that these modern courts—and ***Hedtcke***—based this shift on a recognition that the language of the insurance policy, rather than property law concepts, should control. ***Id.*** at 485 ("Courts adopting the modern rule focus on the contract of insurance rather than the interests and obligations arising from the nature of the property ownership." (footnote omitted)). The ***Hedtcke*** court then determined that the policy was ambiguous as to whether the obligations of the insureds were "joint" (so as to allow a breach to void coverage

9

for other insureds) or "several" (such that any breach by one insured would not affect coverage for another). *Id.* at 487. For that reason, the court found that the obligations were several. *Id.* at 488.

¶16 To be sure, the result in *Hedtcke* was clearly influenced by the public policy rationale underlying the contractual analysis, and the court went to some lengths to note that its decision was consistent with, if not driven by, that rationale. *Id.* at 488-89. That public policy rationale, of course, is that innocent co-insureds should not be denied the contractual benefits of the insurance policies they purchase by the acts of another insured in intentionally causing the loss; to find otherwise is "[c]ontrary to our basic notions of fair play and justice." *Id.* at 488. Having emphasized insurance policy language over property law principles in assessing joint versus several responsibility for complying with policy obligations, and finding the obligations several based on the ambiguities in the policy before it, the court concluded that it "need not and do[es] not decide whether an insurer may make the obligations of the insureds joint." *Id.*

¶17 If *Hedtcke* were the only available case law, perhaps we could at least consider a different result here, given *Hedtcke*'s heavy emphasis on public policy and its expressed uncertainty as to when a policy imposes "joint" or "several" obligations. But *Hedtcke* is not the only case to guide us. In *Northwestern National Insurance Co. v. Nemetz*, 135 Wis. 2d 245, 400 N.W.2d 33 (Ct. App. 1986), we were confronted with a factual scenario facially similar to that in *Hedtcke*—Walter Nemetz deliberately burned down a building jointly owned with his wife Hazel— except that the fire spread to the building next door, leading to a lawsuit and the question of liability coverage for Hazel. *Nemetz*, 135 Wis. 2d at 250-52. Although Hazel was eventually absolved of liability for starting the fire, the policy at issue contained an intentional acts exclusion that barred coverage for liability "expected

or intended by *an* insured." *Id.* at 253. Importantly, the policy also contained a "severability of interest" clause stating that the policy "applies separately to each insured person against whom a claim or suit is brought." *Id.* at 255-56.

¶18 We noted that *Hedtcke* had relied on language limiting application of the condition at issue to "*the* insured," thereby suggesting severability, while the Nemetz's liability policy employed exclusionary language based on acts done by "an insured." *Nemetz*, 135 Wis. 2d at 255-56. We concluded that use of the term "an" amounted to an "attempt[] to join the insureds' obligations." *Id.* at 256. We also concluded, however, that the severability clause rendered the nature of the exclusionary language as joint or several ambiguous. *Id.* Construing such ambiguities against the insurer, as required by black-letter insurance law principles, we concluded that the exclusion did not bar liability coverage to Hazel. *Id.*

¶19 The grammatically-focused inquiry that drove the result in *Nemetz* (and arguably *Hedtcke*) continued with our decision in *Taryn E.F. v. Joshua M.C.*, 178 Wis. 2d 719, 505 N.W.2d 418 (Ct. App. 1993). *Taryn E.F.* involved a minor's allegations of sexual abuse against her babysitter. *Id.* at 721. The minor sued the babysitter, his parents, and their insurer. *Id.* The policy contained a sexual abuse exclusion, which barred coverage based on "*any damages … attributable to …* any outrageous conduct on the part of *any* 'insured.'" *Id.* at 723-24. Even though the policy also contained a severability clause, we concluded that the difference between "an" and "any" was sufficient to alter the result in *Taryn E.F.*, finding that "[t]his language unambiguously denies coverage for all liability incurred by each and any insured as a result of certain conduct by any of the persons insured by the policy." *Id.* at 724.

¶20 These cases remain good law and have been relied on over the past several decades to determine the fate of coverage for "innocent co-insureds." *See, e.g.*, *J.G. v. Wangard*, 2008 WI 99, ¶¶33, 41-50, 313 Wis. 2d 329, 753 N.W.2d 475; *Jessica M.F. v. Liberty Mut. Fire Ins. Co.*, 209 Wis. 2d 42, 52, 58-60, 561 N.W.2d 787 (Ct. App. 1997). And any doubt as to whether this case law applies to a "concealment or fraud" clause is dispelled by *State Farm Fire & Casualty Insurance Co. v. Walker*, 157 Wis. 2d 459, 459 N.W.2d 605 (Ct. App. 1990).

¶21 In *Walker*, this court addressed yet another situation where one of two insureds, Jimmy Walker, was suspected, and later found, to have intentionally caused a fire loss, allegedly without the knowledge of the other insured, Joan Mosby. *Id.* at 463-64. In the course of a post-fire investigation, it was learned that Walker was subject to an outstanding warrant in Colorado on homicide charges, and he was arrested. *Id.* at 463. At Walker's EUO (taken while he was in jail), Walker refused to answer certain questions, including whether Walker was his real name, on Fifth Amendment grounds. *Id.* at 463-64. The insurer denied coverage to both Walker and Mosby due to Walker's breach of the "concealment or fraud" clause, which stated, "If *you or any other insured* under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss, then this policy is void as to you and any other *insured*." *Id.* at 466. Citing *Nemetz*, this court affirmed the trial court's ruling that the clause, by its express terms, voided coverage not only to Walker but also to Mosby. *Walker*, 157 Wis. 2d at 470-71. Furthermore, this court expressly declined to hold that the concealment clause violates public policy, noting that to do so "would be to upset long-established rules of insurance contract interpretation." *Id.* at 471.

¶22    *Walker* largely controls the present case.  The clause at issue states that Kemper "provide[s] coverage to no 'insureds' for loss under Section I—Property Coverages if, whether before or after a loss, an 'insured' has" concealed or misrepresented a material fact on which Kemper relies and which is made with intent to deceive.  Ismet claims that use of the word "an" as opposed to "any" puts this case within the holding of *Nemetz* and takes it out of the holding of *Taryn E.F.*, where the an/any distinction, combined with a severability of insureds provision, became dispositive in the context of an intentional acts exclusion.  *See Nemetz*, 135 Wis. 2d at 256; *Taryn E.F.*, 178 Wis. 2d at 724.  This argument misses the mark.  Here we are not dealing with an exclusion that bars coverage to "an" or "any" insured (or "the insured" for that matter), but rather a provision that provides coverage to "*no* insured" if an insured breaches the provision.  Of at least equal importance, the policy in this case contains no severability clause that formed a critical part of the analysis in *Nemetz*.  *See Nemetz*, 135 Wis. 2d at 255-56.  Consequently, this case falls squarely within the holding of those cases, including *Taryn E.F.* and *Walker*, finding an insured's obligation to be joint.  *See*, *e.g.*, *Walker*, 157 Wis. 2d at 470-71.  Under the terms of the policy, Ybdi's breach of the "concealment or fraud" provision voided coverage to all insureds.

¶23    Ismet makes one additional argument.  She claims that the language of the "concealment or fraud" provision is a "promissory warranty" and therefore subject to other policy provisions in the Wisconsin Endorsement that prevent breach of a promissory warranty from affecting Kemper's obligations unless the breach "exist[s] at the time of loss and either … increase[s] the risk at the time of loss … or … contribute[s] to the loss."  Ismet argues that this language effectively makes it impossible for a breach of the "concealment or fraud" provision to void coverage

because post-loss statements cannot exist at the time of the loss, increase the risk, or contribute to the loss.

¶24     This argument, which would in effect rewrite the terms of the "concealment or fraud" provision to eliminate the "or after a loss" language, misconstrues the meaning of "promissory warranty." The Wisconsin endorsement containing the language referenced by Ismet was presumably issued to conform the policy to WIS. STAT. § 631.11, which contains a nearly identical statutory requirement with respect to "promissory warrant[ies]." The term "promissory warranty" is generally understood to mean "[a] warranty that facts will *continue* to be as stated throughout the policy period, *such that a failure of the warranty provides the insurer with a defense to a claim under the policy*" or a "*continuing warranty.*" ***Fox v. Catholic Knights Ins. Soc'y***, 2003 WI 87, ¶29, 263 Wis. 2d 207, 665 N.W.2d 181 (citation omitted). Promissory warranties in insurance policies generally pertain to commitments by insureds designed to minimize the risk of loss, such as a commitment that no inflammables will be stored on the insured premises or that the insured will maintain a night watchman. *See **id.,*** ¶27. Obviously, minimizing a *risk* of loss can only occur prior to the loss. It is nonsensical to suggest that provisions dealing with post-loss adjustment fall into such a category.

¶25     In short, Ismet correctly notes that "promissory warranty" is a term of art in insurance parlance and correctly defines the term, but is incorrect in describing its application to this case. The portion of the "concealment or fraud" provision at issue here does not involve any "continuing warranty" throughout the policy

period.[8] Rather, it is an obligation to be truthful with the insurer about the cause of loss that arises at a specific point after inception of the policy, namely at the time of loss. It is enforceable per its terms.

¶26 Although our decision results in a loss of coverage to one who the parties agree—and we have no reason to doubt—is an innocent insured, this court is not authorized to rewrite the terms of the agreed-upon policy. Nor, as we stated in *Walker*, is it the role of this court to "announce a public policy that has the effect of overturning long-established rules of insurance contract jurisprudence," even if we felt such a policy were appropriate. *See Walker*, 157 Wis. 2d at 472. Rather, "[s]uch a step can be taken only by the state supreme court" or the legislature. *Id.* Accordingly, we affirm the trial court's grant of summary judgment to Kemper.

*By the Court.*—Order affirmed.

---

[8] For the sake of completeness, we note that the concealment provision obligates the insured not to conceal facts "*before or* after a loss." Concealment that occurs before a loss will typically pertain to representations made in a policy application. Such representations are most properly characterized as "affirmative warranties" as opposed to "promissory warranties." *See Fox v. Catholic Knights Ins. Soc'y*, 2003 WI 87, ¶29, 263 Wis. 2d 207, 665 N.W.2d 181, citing BLACK'S LAW DICTIONARY (7th ed. 1999) (defining "affirmative warranty" as "[a] warranty—express or implied—that facts are as stated at the beginning of the policy period. *An affirmative warranty is usu[ally] a condition precedent to the policy taking effect*."). In any case, the concealment provision cannot be characterized as involving a promissory warranty, particularly as it pertains solely to post-loss conduct.