# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE No.: | 2019AP488 |

| | |
|---|---|
| COMPLETE TITLE: | Kemper Independence Insurance Company, Plaintiff-Respondent, v. Ismet Islami, Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 392 Wis. 2d 866,946 N.W.2d 231
PDC No:2020 WI App 38 - Published

| | |
|---|---|
| OPINION FILED: | June 8, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 22, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | William Domina |

JUSTICES:

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGESNSACK, and HAGEDORN, JJ., joined. KAROFSKY, J., filed a dissenting opinion in which ANN WALSH BRADLEY and DALLET, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Joseph F. Owens* and *Law Offices of Joseph F. Owens, LLC*, New Berlin. There was an oral argument by *Joseph F. Owens*.

For the plaintiff-respondent, there was a brief filed by *James M. Fredericks, Alison E. Kliner*, and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee. There was an oral argument by *James M. Fredericks*.

An amicus curiae brief was filed on behalf of Wisconsin Insurance Alliance by *James A. Friedman, Daniel C.W. Narvey,* and *Godfrey & Kahn, S.C.*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Association for Justice by *Michael J. Cerjak* and *Cannon & Dunphy, S.C.*, Brookfield.

No. 2019AP488
(L.C. No. 2013CV2875)

STATE OF WISCONSIN      :      IN SUPREME COURT

Kemper Independence Insurance Company,

    Plaintiff-Respondent,

    v.

Ismet Islami,

    Defendant-Appellant-Petitioner.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUN 8, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined. KAROFSKY, J., filed a dissenting opinion in which ANN WALSH BRADLEY and DALLET, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA GRASSL BRADLEY, J. Ismet Islami seeks review of the court of appeals decision[1] affirming the Waukesha County Circuit Court's grant of summary judgment in favor of Kemper Independence Insurance Company (Kemper) denying coverage to Ismet

---

[1] Kemper Indep. Ins. Co. v. Islami, 2020 WI App 38, 392 Wis. 2d 866, 946 N.W.2d 231.

for the loss of her home.[2] Ydbi Islami, from whom Ismet is legally separated, intentionally set fire to the home. All parties stipulated that Ydbi concealed facts from Kemper about his involvement in the fire with the intent to deceive, and Kemper relied upon Ydbi's concealment and fraud to its detriment. The circuit court ruled the "concealment or fraud" condition in Kemper's insurance policy covering the home ("the Policy") barred coverage for Ismet's claims. The court of appeals agreed that the Policy did not provide coverage as a result of Ydbi's conduct and affirmed the circuit court's decision.

¶2 Ismet raises three arguments. First, Ismet contends that, given her legal separation from Ydbi, Ydbi is not her spouse and therefore not an "insured" for purposes of the Policy. Second, Ismet argues the Policy's "concealment or fraud" condition is ambiguous, conflicts with the Policy's "intentional loss" exclusion, and therefore does not bar coverage. Third, Ismet asserts she is an innocent insured and the victim of domestic abuse, thereby requiring Kemper to provide coverage under Wis. Stat. § 631.95(2)(f)'s domestic abuse exception to a property insurer's intentional act exclusion.

¶3 We hold: (1) Ydbi is an insured under the terms of the Policy, both under the plain language of the insurance contract and because Wisconsin's marriage laws recognize Ydbi as Ismet's spouse; (2) the Policy's "concealment or fraud" condition

---

[2] The Honorable Judge William J. Domina, Waukesha County Circuit Court, presided.

2

precludes coverage for Ismet——a conclusion unaffected by the Policy's "intentional loss" exclusion; and (3) Wis. Stat. § 631.95(2)(f) does not apply because the record lacks any evidence showing Ydbi's arson constituted "domestic abuse" against Ismet, as statutorily defined. Accordingly, we affirm the decision of the court of appeals.

## I.   BACKGROUND

¶4   Ismet and Ydbi married in 1978. In 1988, Ydbi was convicted of a number of crimes, including stalking and sexual assault of a minor, involving victims other than Ismet. Following these incidents, Ismet initially sought a divorce from Ydbi but, for religious reasons, obtained a legal separation instead. As part of the separation, which occurred in 1998, both parties entered into a Marital Settlement Agreement, under which Ismet received sole ownership of their home in Oconomowoc, although Ismet and Ydbi continued to live in the home together. Neither party proceeded with a divorce.

¶5   In 2012, Kemper issued a "Package Plus" home and automobile insurance policy covering Ismet's Oconomowoc home and listed automobiles. Under the Policy, Ismet is listed as the "Named Insured." However, the introduction to the Policy reads: "Throughout the policy, 'you' and 'your' mean the person shown as the 'Named Insured' in the Declarations. It also means the spouse if a resident of the same household." The Policy further states that "insured" means "you and residents of your household who are . . . [y]our relatives." Additionally, both Ismet and Ydbi are listed in the vehicle coverage section as "Operator 1" and

"Operator 2," respectively. Both parties also marked their marital status as "Married."

¶6 The Policy also contains a "concealment or fraud" condition. As relevant to this dispute, the provision bars coverage for "all insureds" if "an insured" concealed or misrepresented a material fact, with intent to deceive and on which Kemper relied. In full, the provision reads:

> Under Section 1 – Property Coverages, with respect to all "insureds" covered under this policy, we provide coverage to no "insureds" for loss under Section 1 – Property Coverages if, whether before or after a loss, an "insured" has:
>
> 1) Concealed or misrepresented any fact upon which we rely, and that concealment or misrepresentation is material and made with intent to deceive; or
>
> 2) Concealed or misrepresented any fact and the fact misrepresented contributes to the loss.

¶7 Importantly for purposes of Ismet's argument, the Policy also contains an "intentional loss" exclusion. That provision bars recovery for "an insured" who "commits or conspires to commit an act with the intent to cause a loss." As material to Ismet's argument, the provision provides as follows:

> 1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> . . . .
>
> 1h. Intentional Loss.

4

> Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.
>
> This exclusion only applies to an "insured" who commits or conspires to commit an act with the intent to cause a loss.

¶8 In June 2013, a fire occurred at the Oconomowoc home, damaging the property and its contents and rendering the home a total loss. Per the Policy, Kemper sent Ismet and Ydbi a "Sworn Statement in Proof of Loss." In the signed statement, both Ismet and Ydbi attested that the "the cause and origin" of the fire was "unknown."[3] They also represented to Kemper in the statement that they were each "insureds" under the Policy. Kemper later conducted a formal examination of Ismet and Ydbi with both answering questions under oath (hereinafter "Examination Under Oath"). In response to questions during that examination, both Ismet and Ydbi swore they were not aware the house burned down until after receiving notice of the incident.[4]

¶9 Despite these attestations, further investigation revealed that Ydbi had started the fire. The fire occurred while Ismet was vacationing overseas in North Macedonia——a fact indisputably known by Ydbi. In a separate criminal proceeding,

---

[3] More specifically, Ismet and Ydbi attested: "A Fire Loss occurred about 10:30 o'clock P.M., on the 10th day of June 2013. The cause and origin of said loss was unknown."

[4] According to Ismet, she first learned about the fire during a phone call from her niece approximately seven hours after the fire. According to Ydbi, he learned about the fire while at a Milwaukee casino from a man he could not remember.

the State eventually charged Ydbi with arson, for which he was convicted.

¶10 Relying on the Policy's "concealment or fraud" condition (among other provisions), Kemper denied coverage for the loss of the home. After its denial of the claim, Kemper commenced a declaratory judgment action seeking a judicial determination of its rights and obligations under the Policy. In particular, Kemper sought, inter alia, a declaration that the "concealment or fraud" condition barred coverage for both Ismet and Ydbi.

¶11 Both parties eventually filed motions for summary judgment on stipulated facts. Specifically, all parties stipulated to the following: (1) Ydbi committed arson to destroy the Oconomowoc home; (2) if Ydbi is found to be an "insured" under the Policy, "Ydbi . . . was a resident of Ismet['s] . . . household"; (3) "Ydbi . . . engaged in concealment and fraud in his statement[s] to Kemper" about his involvement in the fire "with the intent to deceive Kemper, and Kemper relied upon Ydbi's concealment and fraud to its detriment"; (4) "the fire was not a result of Ismet committing or conspiring to commit any act with the intention of damaging the property . . . "; and (5) Ismet is an "innocent insured" under the Policy.

¶12 Ultimately, the circuit court granted Kemper's motion for summary judgment, finding that Ydbi was an "insured" under the Policy, and Ismet's and Ydbi's legal separation in 1998 did not alter Ydbi's status. The circuit court further found that, because Ydbi was an "insured," the "concealment or fraud" condition barred

6

recovery for Ismet. Lastly, the circuit court determined that, because the record was devoid of any evidence of domestic abuse, Wis. Stat. § 631.95(2)(f) did not preclude Kemper from denying coverage. Ismet appealed the decision to the court of appeals, which affirmed the circuit court's ruling. We granted Ismet's petition for review.

## II. STANDARD OF REVIEW

¶13 This case comes before us as a review of a grant of summary judgment. "Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." Talley v. Mustafa Mustafa, 2018 WI 47, ¶12, 381 Wis. 2d 393, 911 N.W.2d 55 (citing Wis. Stat. § 802.08(2)). "We independently review a grant of summary judgment using the same methodology of the circuit court and the court of appeals." Id. (citation omitted); see also Romero v. West Bend Mut. Ins. Co., 2016 WI App 59, ¶17, 371 Wis. 2d 478, 885 N.W.2d 591.

## III. DISCUSSION

### A. Ydbi is an "insured" under the Policy.

¶14 Ismet contends Ydbi is not her spouse because they are legally separated; therefore, according to Ismet, Ydbi is not an "insured" under the Policy. We disagree.

¶15 Whether Ydbi is Ismet's "spouse" for purposes of insurance coverage is governed by the terms of the insurance contract. The Policy definitions answer this question: "Throughout the policy, 'you' and 'your' mean the person shown as the 'Named Insured' in the Declarations. It also means the spouse

7

if a resident of the same household." (Emphasis added.) The Policy defines "insured" as "you and residents of your household who are . . . [y]our relatives." (Emphasis added.) Ydbi may be an "insured" under the policy if he is either Ismet's spouse or relative, provided he resides in Ismet's household. There is no dispute Ismet and Ydbi were residents of the same household.

¶16 We interpret the provisions of an insurance policy using the same principles applicable to contracts generally. "[I]nsurance policies are contracts to which courts apply the same rules of law applicable to other contracts." Talley, 381 Wis. 2d 393, ¶35; see also McPhee v. Am. Motorists Ins. Co., 57 Wis. 2d 669, 673, 205 N.W.2d 152 (1973) ("Contracts of insurance rest upon and are controlled by the same principles of law that are applicable to other contracts[.]"). Applying the plain language of the Policy, we conclude that Ismet and Ydbi are "spouses" for purposes of the contract. "[T]he language of a contract must be understood to mean what it clearly expresses, and the courts may not depart from the plain meaning of a contract when it is free from ambiguities." Matter of Watertown Tractor & Equip. Co., Inc., 94 Wis. 2d 622, 637, 289 N.W.2d 288 (1980) (quoted source omitted). In the Policy's listed vehicle coverage section, Ismet and Ydbi are listed as "Operator 1" and Operator 2," respectively. The contract then explicitly indicates the marital status of both Ismet and Ydbi as "Married." Because the Policy expressly designates Ismet and Ydbi as spouses, Ydbi meets the definition of "you" under the Policy, which makes Ydbi an "insured."

¶17 Additionally, both Ismet and Ydbi represented to Kemper that they were each "insureds" under the insurance contract. In determining whether a named insured's spouse is covered under a policy, courts may look to the "expectations of the parties," considering, among other factors, whether a couple "liv[es] under the same roof," whether they have a "close, intimate, and informal relationship," and "where the intended duration is likely to be substantial, where it is consistent with the informality of the relationship, . . . it is reasonable to conclude that the parties would consider the relationship . . . in contracting about such matters as insurance or in their conduct in reliance thereon." Belling v. Harn, 65 Wis. 2d 108, 113, 221 N.W.2d 888 (1974). All of these factors are satisfied here. Ismet and Ydbi lived under the same roof of the Oconomowoc home; they are in a relationship recognized as marital under Wisconsin law, albeit legally separated; and they each considered their relationship when contracting with Kemper, as demonstrated by listing their status as "Married." Critically, both Ismet and Ydbi also stated in their "Sworn Statement in Proof of Loss" that they were each "insureds" under the contract. With this understanding, Kemper conducted an Examination Under Oath of both Ismet and Ydbi, during which Ismet repeatedly stated for the record that Ydbi was her "husband." Giving effect to the expectations of the parties, and applying the plain language of the contract, Ismet and Ydbi are "spouses" and therefore insureds under the Policy.

¶18 Although Ismet and Ydbi are also "spouses" under Wisconsin's marriage laws, Ismet argues that their legal

9

separation alters their status as spouses under the law and therefore under the Policy. We disagree. Wisconsin law plainly distinguishes between a divorce and a legal separation. Pursuant to Wis. Stat. § 767.001(1f),[5] "divorce" is defined as "the dissolution of the marriage relationship." Once a judgment of divorce is entered, parties are free to remarry another individual, so long as it has been six months since the date of judgment. Wis. Stat. § 765.03(2). In contrast, a judgment of legal separation does not terminate a marriage. As this court has previously noted, "there are . . . rights and obligations remaining in the marriage after a legal separation." Herbst v. Hansen, 46 Wis. 2d 697, 706, 176 N.W.2d 380 (1970) (emphasis added). For example, legally separated couples may reconcile after a judgment for legal separation without having to get remarried. Wis. Stat. § 767.35(4). Additionally, because they are still recognized as "married" under the law, legally separated couples are also precluded from marrying other individuals until six months after they obtain a judgment of divorce. See § 765.03(2). Indeed, as the Wisconsin Court System's own guidance to the public instructs, "legal separation does not end a marriage"——only divorce proceedings do.[6]

---

[5] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[6] https://www.wicourts.gov/formdisplay/FA-4100V_instructions.pdf?formNumber=FA-4100V&formType=Instructions&formatId=2&language=en.

¶19 Given that Ismet and Ydbi never initiated divorce proceedings but instead received a judgment of legal separation, they remained married under Wisconsin law. Ydbi is Ismet's "spouse" under the Policy as well. Both parties stipulated that Ydbi was "a resident of the same household" as Ismet. Because Ydbi is Ismet's spouse who resided in Ismet's household, Ydbi is an "insured" under the Policy. These conclusions are consistent with the expectations of both Ismet and Ydbi, as reflected in their representations to Kemper regarding their marital status and their status as "insureds" under the contract.

¶20 Despite the clear language in Wis. Stat. ch. 767, Ismet argues Wis. Stat. ch. 766, the Marital Property Act, controls Ismet's and Ydbi's status as "spouses" under Wisconsin law. Because Chapter 766 contemplates that the "dissolution" of a marriage may involve a judgment of legal separation, Ismet argues that once she and Ydbi entered into a judgment of legal separation, they were no longer spouses. See Wis. Stat. § 766.01(7). This argument misunderstands the nature and scope of Chapter 766. The Marital Property Act "provides rules which govern the ownership as well as management and control of property owned by married persons during their marriage . . . [and] at death." Kuhlman v. Kuhlman, 146 Wis. 2d 588, 592, 432 N.W.2d 295 (1988) (emphasis added) (quoted source omitted). Chapter 767, on the other hand, contains Wisconsin's "divorce rules and policies." Id. at 593. That is, while Chapter 766 pertains to the control and management of marital property, Chapter 767 governs the actual legal status of married persons. The "substantial differences between [Chapter 766 and

11

Chapter 767] . . . did not come about by chance; they were deliberately drawn by the legislature to achieve different goals." Id. Indeed, Chapter 766 "was not intended to change the law of divorce or other forms of dissolution." Id. (quoted source omitted). Chapter 767 controls the dissolution of marriage and under its provisions, Ismet and Ydbi were still "spouses" by law as well as under the Policy. As spouses who resided in the same household, both Ismet and Ydbi were "insureds" under the terms of the Policy.

### B. The "concealment or fraud" condition bars coverage for Ismet under the Policy.

¶21 Ismet next contends the "concealment or fraud" condition does not bar coverage for Ismet, because, according to her argument, its language is ambiguous and conflicts with the Policy's "intentional loss" exclusion. Ismet relies on Hedtcke v. Sentry Insurance Co., 109 Wis. 2d 461, 326 N.W.2d 727 (1992), to support her position. We are not persuaded.

¶22 Principles of contract interpretation control the resolution of this issue as well. "Contracts of insurance rest upon and are controlled by the same principles of law that are applicable to other contracts, and parties to an insurance contract may provide such provisions as they deem proper so long as the contract does not contravene law or public policy." McPhee, 57 Wis. 2d at 673. "[U]nambiguous contract language controls contract interpretation." Tufail v. Midwest Hosp., LLC, 2013 WI 62, ¶25, 348 Wis. 2d 631, 833 N.W.2d 586 (quoted source omitted). "When the terms of a contract are plain and unambiguous, we will

12

construe the contract as it stands." Kernz v. J.L. French Corp., 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751 (quoted source omitted); see also Folkmann v. Quamme, 2003 WI 116, ¶13, 264 Wis. 2d 617, 665 N.W.2d 857 ("If there is no ambiguity in the language of an insurance policy, it is enforced as written[.]") (citation omitted).

¶23 In this case, the Policy terms are plain and unambiguous, including the "concealment or fraud" condition. That provision states, in relevant part: "with respect to all 'insureds' covered under this policy, [Kemper] provide[s] coverage to no 'insureds' for loss" due to concealment or misrepresentation of (1) a material fact with the intent to deceive, which is relied upon by Kemper, or (2) any fact where the misrepresentation "contribut[ed] to the loss." (Emphasis added.) This language plainly excludes coverage for all insureds if any insured conceals or misrepresents a material fact, with the intent to deceive and on which Kemper relies.

¶24 Because both Ismet and Ydbi are insureds under the Policy, if either so concealed or misrepresented a material fact on which Kemper relied, neither individual can recover. All parties stipulated that "Ydbi . . . engaged in concealment and fraud in his statement[s] to Kemper" about his involvement in the fire "with the intent to deceive Kemper, and Kemper relied upon Ydbi's concealment and fraud to its detriment." Applying the unambiguous language of the "concealment or fraud" condition to these agreed-upon facts, we conclude that Ydbi——an insured——

13

satisfied each element of the Policy's "concealment or fraud" condition, thereby precluding coverage for Ismet.

¶25 Ismet argues that the Policy's "intentional loss" exclusion conflicts with the "concealment or fraud" condition, rendering the latter ambiguous. We disagree. As defined under the Policy, "intentional loss" means "any act 'an insured' commits or conspires to commit with the intent to cause a loss." Ydbi's act of arson, which caused the loss of the Oconomowoc home, meets this definition. Unlike the "concealment or fraud" condition, "this exclusion only applies to 'an insured' who commits or conspires to commit an act with the intent to cause a loss." (Emphasis added.) Accordingly, Ismet does not lose coverage under the "intentional loss" exclusion. In contrast, the "concealment or fraud" condition eliminates coverage not only for the insured who commits the intentional act causing loss, but for all insureds.

¶26 There is nothing conflicting about these provisions of the Policy. Each provision simply applies in different circumstances. In the presence of fraud, no insured can recover by operation of the "concealment or fraud" condition. When there is only "intentional loss" without any fraud, the Policy allows "innocent insureds" to recover by operation of the "intentional loss" exclusion. It is the role of courts to "construe and enforce such agreements as made and not make new contracts for the parties." McPhee, 57 Wis. 2d at 673. "A construction that gives meaning to every provision of a contract is preferable to an interpretation that leaves part of the policy without meaning." Romero, 371 Wis. 2d 478, ¶18; see also 1325 N. Van Buren, LLC v.

14

T-3 Grp., Ltd., 2006 WI 94, ¶56, 293 Wis. 2d 410, 716 N.W.2d 822. In order to give effect to every provision of the Policy, both the "intentional loss" exclusion and the "concealment or fraud" condition must be read in harmony. Neither Policy provision renders the other superfluous or ambiguous. The provisions mean what they say, and it is the job of this court to apply them. See Folkmann, 264 Wis. 2d 617, ¶17 ("As a general rule, the language in an insurance contract is given its common, ordinary meaning, that is, what the reasonable person in the position of the insured would have understood the words to mean.") (internal quotations and citations omitted). Ydbi committed arson, lied to Kemper in his "Sworn Statement in Proof of Loss" and Examination Under Oath, and induced Kemper to rely upon his lies. Under the "concealment or fraud" condition, the Policy provides coverage for "no insureds"——including Ismet.

¶27 Contrary to Ismet's argument, this court's prior decision in Hedtcke does not alter this conclusion. According to Hedtcke, when an exclusion is ambiguous and does not state "whether the obligations of the insured are joint or several," public policy dictates allowing innocent insureds to recover. Hedtcke, 109 Wis. 2d at 487-88. In other words, when a provision is unclear as to whether an insured's obligations are "joint" or "several," courts should assume they are "several." Id. The Hedtcke court declared this rule necessary to "effectuate the public policy that guilty persons must not profit from their own wrongdoing." Id. at 488.

15

¶28 Hedtcke's rule applies when a coverage exclusion is ambiguous. See id. at 487-88. In this case, the "concealment or fraud" condition, unlike the contractual provision at issue in Hedtcke, does specify that the obligations of the insureds are "joint": "with respect to all 'insureds' covered under this policy, [Kemper] provide[s] coverage to no 'insureds' for loss" in the event of concealment or fraud. (Emphasis added.)

¶29 We apply the plain language of the "concealment or fraud" condition consistent with Wisconsin precedent. In Taryn E.F. by Grunewald v. Joshua M.C., 178 Wis. 2d 719, 505 N.W.2d 418 (Ct. App. 1993), the court of appeals gave full effect to the plain language of a "joint" exclusion, which provided: "insurance . . . shall not apply to any damages . . . attributable to . . . any outrageous conduct on the part of any 'insured' consisting of any intentional, wanton, [or] malicious acts[.]" Id. at 724. The court held that "[t]his language unambiguously denies coverage for all liability incurred by each and any insured." Id. Likewise, in State Farm Fire & Cas. Ins. Co. v. Walker, 157 Wis. 2d 459, 459 N.W.2d 605 (Ct. App. 1990), the court of appeals applied the plain meaning of a "concealment or fraud" clause, which provided as follows: "If you or any other insured under this policy has intentionally concealed or misrepresented any material facts . . . , then this policy is void as to you and any other insured." Id. at 466. According to the Walker court, the policy provision meant what it said: "the concealment clause unambiguously denies recovery to an innocent insured when another insured breaches the concealment clause." Id. at 467. The Walker

16

court determined <u>Hedtcke</u> had no bearing on the case because a "court must not modify clear and unambiguous language" when a provision plainly expresses a "joint" exclusion.  <u>Id.</u> at 471. "When the terms of a policy are plain on their face, the policy should not be rewritten by construction to bind the insurer to a risk it was unwilling to cover, and for which it was not paid." <u>Id.</u> at 471-72 (citations omitted).

¶30 Just like in <u>Taryn E.F.</u> and <u>Walker</u>, <u>Hedtcke</u> has no bearing on the insurance contract before us.  Because the language of the "concealment or fraud" condition is plain and unambiguous, this court must enforce it and public policy considerations may not rewrite the contract.  Ismet lost coverage because "no insured" may recover when any insured engages in concealment or fraud under the Policy, as Ydbi did in this case.[7]

_____

[7] Ismet also argues that Ydbi's untruthful statements and omissions to Kemper, including during his Examination Under Oath and in his "Sworn Statement in Proof of Loss," collectively constitute a breach of a promissory warranty.  "Condition G" of the Policy reads:  "[N]o breach of a promissory warranty affects [Kemper's] obligations under this policy unless . . . the breach exists at the time of loss and either:  (a) increases the risk at the time of loss; or (b) contribute[s] to the loss."  According to Ismet, pursuant to "Condition G," Kemper cannot deny her coverage under the "concealment or fraud" condition because Ydbi's concealments occurred <u>after</u> the property loss and therefore did not increase the risk "at the time of loss" or contribute to the loss. (continued)

C. Wis. Stat. § 631.95(2)(f) does not support Ismet's claim.

¶31 As a final matter, Ismet asserts that Wis. Stat. § 631.95(2)(f), a statute which may allow "innocent insureds" to retain coverage that might otherwise be excluded due to intentional loss resulting from acts or patterns of domestic abuse, preserves coverage for her loss notwithstanding the "concealment or fraud" condition. Based on the record before us, this statute does not apply.

¶32 In relevant part, Wisconsin Stat. § 631.95(2)(f) reads:

> An insurer may not[,]. . . [u]nder property insurance coverage that excludes coverage for loss or damage to property resulting from intentional acts, deny payment to an insured for a claim based on property loss or damage resulting from an act, or pattern, of abuse or domestic abuse if that insured did not cooperate in or contribute to the creation of the loss or damage and if the person who committed the act or acts that caused the loss or damage is criminally prosecuted for the act or acts.

---

We disagree. "Condition G" does not apply. Under Wisconsin law, a promissory warranty is "[a] warranty that facts will continue to be as stated throughout the policy period[.]" Fox v. Catholic Knights Ins. Soc., 2003 WI 87, ¶29, 263 Wis. 2d 207, 665 N.W.2d 181 (quoted source omitted). In essence, promissory warranties are generally commitments by an insured designed to minimize the risk of loss, such as a promise that an insured will not store flammables on insured property. See id., ¶27. Such risk minimization can occur only before the loss. In this case, the "concealment or fraud" by Ydbi occurred after the loss. Ydbi's concealment of his act of arson could not constitute a promissory warranty because it was not a representation designed to minimize the risk of loss but rather a fraud on Kemper after the arson caused the loss.

¶33 Under this statute, "'[d]omestic abuse' has the meaning given in [Wis. Stat.] § 968.075(1)(a)." Wis. Stat. § 631.95(1)(c). Under § 968.075(1)(a), "domestic abuse" is defined as any of four separate actions "engaged in by an adult person against his or her spouse or former spouse." The four actions are as follows:

1. Intentional infliction of physical pain, physical injury or illness.

2. Intentional impairment of physical condition.

3. A violation of s. 940.225(1), (2), or (3).[8]

4. A physical act that may cause the other person reasonably to fear imminent engagement in the conduct described under subd. 1., 2., or 3.

§ 968.075(1)(a).

¶34 Ismet does not claim that Ydbi engaged in any acts meeting the first three definitions of domestic abuse. Instead, Ismet contends that Ydbi's act of arson, in and of itself, constitutes "a physical act that may cause [her] reasonably to fear imminent engagement in the conduct described" in the preceding three clauses. While an act of arson may qualify as a "physical act" under the fourth definition of "domestic abuse," Ismet fails to identify any evidence in the record establishing that she "reasonably . . . fear[ed] imminent engagement" in the sort of bodily harm described in this statute. In particular, there is no evidence that Ydbi started the fire to harm Ismet; in fact, Ismet

---

[8] All three of these subsections of Wis. Stat. § 940.225 involve sexual assault.

was overseas in North Macedonia when the arson occurred——a fact indisputably known by Ydbi.

¶35 Ismet does not point to any evidence in the record that she reasonably feared for her safety. Her affidavit contains no statements of fact related to any fears regarding Ydbi, or any past or ongoing instances of physical or sexual abuse by Ydbi. Instead, Ismet mentions only Ydbi's past criminal actions over 25 years ago against other individuals. Wisconsin Stat. § 631.95(2)(f) says the property loss must "result" from an act of domestic abuse, as it is defined in that statute. (Emphasis added.) In the absence of evidence sufficient to satisfy that definition, the statute cannot apply to restore coverage. When opposing a motion for summary judgment, the party "is obligated to submit materials . . . to counter the submissions of the moving party. It is not enough to simply claim that the moving party's submission should be disbelieved or discounted." Dawson v. Goldammer, 2006 WI App 158, ¶31, 295 Wis. 2d 728, 722 N.W.2d 106 (internal quotations omitted). Pursuant to § 631.95(2)(f) and our well-settled standard for summary judgment, Ismet was required to present at least some evidence connecting the arson and resulting property loss to her fear of imminent bodily harm. See Bd. of Regents of Univ. of Wisconsin Sys. v. Mussallem, 94 Wis. 2d 657, 673, 289 N.W.2d 801 (1980) ("[T]he party in opposition to the motion [of summary judgment] may not rest upon the mere allegations or denials of the pleadings, but must, by affidavits or other statutory means, set forth specific facts showing that there exists a genuine issue[.]"). Her failure to do so defeats

20

the application of § 631.95(2)(f), and the "concealment or fraud" condition precludes coverage.

## IV. CONCLUSION

¶36 We conclude the circuit court properly granted Kemper's motion for summary judgment. Ydbi is an insured under the terms of the Policy and because he "concealed or misrepresented" a material fact, "with intent to deceive" and upon which Kemper relied, the Policy's "concealment or fraud" condition precludes coverage for Ismet. Wisconsin Stat. § 631.95(2)(f) does not override the operation of that condition because the record lacks any evidence to establish that Ydbi's arson constituted "domestic abuse" against Ismet, as statutorily defined. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶37 JILL J. KAROFSKY, J. *(dissenting).* "If we are to fight discrimination and injustice against women we must start from the home for if a woman cannot be safe in her own house then she cannot be expected to feel safe anywhere."[1] First and foremost, this case is about domestic abuse. The majority errs in concluding the record in this case "lacks any evidence showing Ydbi's arson constituted 'domestic abuse' against Ismet, as statutorily defined." Majority op., ¶3. This erroneous determination——that there is no genuine issue of material fact regarding whether Ydbi's actions constitute domestic abuse——is based on a misreading of the plain statutory language of Wis. Stat. § 968.075(1)(a)4.

¶38 In misconstruing Wis. Stat. § 968.075(1)(a)4., the majority creates four new hurdles for domestic violence victims seeking recovery under their insurance policies, pursuant to Wis. Stat. § 631.95, for property destroyed by their abusers. According to the majority's analysis, in order to establish domestic abuse, a victim must: (1) show her fear; (2) disclose past or ongoing instances of physical or sexual abuse; (3) prove her abuser's motive; and (4) be physically present at the crime scene when the crime occurs. These requirements have no basis in the statutory language of § 968.075(1)(a)4., and by failing to follow the statutory text, the majority denies Ismet——an "innocent insured"——the very insurance coverage § 631.95 was created to protect.

---

[1] Aysha Taryam, http://raptreveries.blogspot.com/2015/10/its-time-for-law-against-domestic.html (last visited June 2, 2021).

Because the majority misreads the statute and creates new requirements in order for victims to receive insurance coverage, I must dissent.[2]

¶39 I begin this dissent with a succinct discussion of the relevant facts. Next, I analyze the plain and unambiguous language of Wis. Stat. § 631.95(2)(f), which prohibits insurance companies from discriminating against victims of domestic abuse, and Wis. Stat. § 968.075(1)(a), which defines domestic abuse. I also summarize the context in which the legislature drafted these statutes. I conclude by addressing the majority's failed analysis.

## I. FACTUAL BACKGROUND

¶40 Ismet and Ydbi Islami were married in 1978. Approximately ten years later, Ydbi was convicted of stalking and second-degree sexual assault of a child, for which a judge sentenced him to three years in prison and ordered him to register as a sex offender. Ismet's distress over Ydbi's criminal conduct led her to file for a legal separation in 1998.

¶41 Under the terms of the legal separation, Ismet became the sole title owner of the Islamis' Oconomowoc home and the sole named insured in a homeowner's policy issued by Kemper Insurance. The homeowner's policy contained exclusions if an insured intentionally engaged in "fraud or concealment" by conspiring or committing the act that caused the loss, or by concealing or misrepresenting any fact upon which Kemper could rely to address a claim.

---

[2] This dissent only reaches the domestic abuse issue raised by Ismet since that issue is dispositive.

¶42 On June 10, 2013, while Ismet was in North Macedonia, Ydbi burned her house to the ground, destroying all that was inside. Ydbi then lied to Kemper, denying any knowledge about the arson. Ultimately, an investigation revealed that Ydbi was solely responsible. Ydbi was charged and convicted of arson, and sentenced to prison.

¶43 Kemper denied coverage to Ismet for her house and belongings damaged in the fire because Ydbi violated the "concealment or fraud" provision of the insurance policy when he lied about the arson. The circuit court granted summary judgment to Kemper, concluding there was no genuine issue of material fact regarding the applicability of Wis. Stat. § 631.95(2)(f), and the court of appeals affirmed.

## II. WISCONSIN STAT. §§ 631.95(2)(f) AND 968.075(1)(a)

¶44 Ismet's situation is not unique. In 1982, this court recognized how the suffering of domestic abuse victims is compounded when their property is destroyed through arson and yet insurance companies deny their claims. See Hedtcke v. Sentry Ins. Co., 109 Wis. 2d 461, 488, 326 N.W.2d 727 (1982) ("An absolute bar to recovery by an innocent insured is particularly harsh in a case in which the arson appears to be retribution against the innocent insured. Having lost the property, the innocent insured is

victimized once again by the denial of the proceeds forthcoming under the fire insurance policy.").[3]

¶45 Insurance companies were engaging in these types of practices in increasing numbers by the mid-to-late 1990s. As a result, domestic violence victims were left without homes or any means to be financially compensated for their losses. "The immediate impact of this discrimination is to deny battered women and their families the life necessities that only insurance can provide." Terry L. Fromson & Nancy Durborow, Insurance Discrimination Against Victims of Domestic Violence 4, 5 (National Health Resource Center on Domestic Violence, 2019). To combat this discrimination, state legislatures, including Wisconsin's, passed laws to protect domestic violence victims.

---

[3] Strikingly, it is not uncommon for perpetrators of domestic violence to commit arson. See, e.g., Garrison v. State, 409 P.3d 1209 (Wyo. 2018) (jury convicted defendant on a charge of first-degree arson for setting fire to his estranged wife's trailer home); Icenhour v. Cont'l Ins. Co., 365 F.Supp.2d 743 (S.D. W. Va. 2004) (woman, who was victim of long-term domestic abuse by her husband, was told her by husband that if she took a trip he would violate a protection order and burn the family home down——when she left town on the trip, he did just that); State v. Goodman, 30 P.3d 516 (Wash. Ct. App. 2001) (husband, released on bail, returned to his wife's home and burned it down, killing her dog); Calhoun v. State, 820 P.2d 819 (Okla. Crim. App. 1991) (husband, who was prohibited by a restraining order from coming near his estranged wife, set fire to her dwelling); Moore v. Oklahoma, 736 P.2d 996 (Okla. Crim. App. 1987) (man convicted for the arson of his estranged wife's residence). There are also a significant number of legal writings discussing this issue. See, e.g., Brent R. Lindahl, Insurance Coverage for an Innocent Co-Insured Spouse, 23 Wm. Mitchell L. Rev. 433, 455-56 (1997) ("When a spouse burns down the marital home, it is often an act of domestic violence or part of an ongoing pattern of domestic violence, where the arson is simply the abuser's current weapon of choice. Domestic violence largely is motivated by the abusive spouse's desire to control and dominate the other spouse.").

4

¶46 Wisconsin's response to the discriminatory practices of insurance companies against victims of domestic abuse was 1999 Wis. Act 95. Codified as Wis. Stat. § 631.95(2)(f), the statute restricts insurers from denying coverage for property damage committed as an act of domestic abuse, and is the cornerstone of this case. Specifically, the statute says:

> [A]n insurer may not[,]. . . [u]nder property insurance coverage that excludes coverage for loss or damage to property resulting from intentional acts, deny payment to an insured for a claim based on property loss or damage resulting from an act, or pattern, of abuse or domestic abuse if that insured did not cooperate in or contribute to the creation of the loss or damage and if the person who committed the act or acts that caused the loss or damage is criminally prosecuted for the act or acts.

§ 631.95(2)(f).

¶47 Pursuant to Wis. Stat. § 631.95(2)(f), insurers must grant coverage when:

- the claim is for property loss or damage;

- the property loss or damage resulted from an act, or pattern, of abuse or domestic abuse;

- the insured did not cooperate or contribute to creation of the loss or damage; and

- the person who committed the act that caused loss or damage is criminally prosecuted.

Relevant to this case is the second prong——whether the "property loss or damage resulted from an act, or pattern, of abuse or domestic abuse." The statute allows recovery for a loss or damage resulting from a single act of domestic abuse, such as an arson,

5

or from a pattern of domestic abuse. For the definition of domestic abuse we look to Wis. Stat. § 968.075(1)(a).

¶48 Wisconsin Stat. § 968.075, Wisconsin's mandatory-arrest statute, was enacted in 1987 in response to the "public perception of the serious consequences of domestic violence to society and to individual victims. . . ." 1987 Wis. Act 346, § 1. The legislature passed this law to ensure that "[t]he official response to cases of domestic violence stress the enforcement of the laws, protect the victim and communicate the attitude that violent behavior is neither excused nor tolerated." Id. The stated purpose of this law was "to recognize domestic violence as involving serious criminal offenses and to provide increased protection for the victims of domestic violence." Id.

¶49 Wisconsin Stat. § 968.075(1)(a) states that "'[d]omestic abuse' means any of the following engaged in by an adult person against his or her spouse or former spouse[:]"

1. Intentional infliction of physical pain, physical injury or illness.

2. Intentional impairment of physical condition.

3. A violation of s. 940.225 (1), (2) or (3).

4. A physical act that may cause the other person reasonably to fear imminent engagement in the conduct described under subd. 1., 2. or 3.

The first three definitions of domestic abuse are not at issue in this case. We are concerned solely with whether Ydbi's arson constituted domestic abuse under subd. 4.

¶50 There is no dispute that the arson was "a physical act." This case is focused on whether, at summary judgment, there was a

genuine issue of material fact as to whether Ydbi's arson was an act that may have caused Ismet to reasonably fear imminent engagement of bodily harm.

¶51  Of import to our analysis, the legislature used the words "may" and "reasonably" in Wis. Stat. § 968.075(1)(a)4. to establish an objective standard.  "The word 'reasonable' has a well-established meaning when used in a legal context.  It generally connotes a 'reasonable-person standard,' a standard that 'has been relied upon in all branches of the law for generations.'" State v. Nelson, 2006 WI App 124, ¶20, 294 Wis. 2d 578, 718 N.W.2d 168 (quoting City of Madison v. Baumann, 162 Wis. 2d 660, 677-78, 470 N.W.2d 296 (1991)); see Id. (quoting State v. Ruesch, 214 Wis. 2d 548, 563, 571 N.W.2d 898 (Ct. App. 1997))("Significantly, 'reasonable,' or the 'reasonable person standard,' establishes an objective standard for evaluating conduct.").

¶52  Further establishing an objective standard is the word "may" in Wis. Stat. § 968.075(1)(a)4., which is an expression of possibility.  "May" is synonymous with "might."  See Black's Law Dictionary 1172 (11th ed. 2019) (defining "may" as "[t]o be permitted to" and "[t]o be a possibility").[4]

¶53  In addition to establishing an objective standard, the legislature used the word "imminent" to qualify "engagement of

---

[4] This objective standard is also an important component of domestic abuse statutes because "[i]t can be difficult for someone to admit that they've been or are being abused.  They may feel that they've done something wrong, that they deserve the abuse, or that experiencing abuse is a sign of weakness." https://www.thehotline.org/support-others/why-people-stay/.  In other words, it can be re-traumatizing for victims to explicitly say, "I am afraid."

7

bodily harm." Imminent means "impending" or "threatening." See Black's Law Dictionary 898 (defining "imminent" as "threatening to occur immediately; dangerously impending"). Importantly, the word "imminent" does not means "immediate." Black's Law Dictionary defines "immediate" as "[o]ccurring without delay; instant." Id. at 897.

¶54 Reviewing Wis. Stat. § 968.075(1)(a)4. in context further proves that the two terms are not synonymous. In the same statute, the legislature used the words "immediate" and "immediately." See Wis. Stat. § 968.075(2m), (4), (5)(a)1., and (6). See State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes . . . ."). This context shows us that the legislature knew how to use the word "immediate." "When the legislature uses different terms in a statute——particularly in the same section——we presume it intended the terms to have distinct meanings." Johnson v. City of Edgerton, 207 Wis. 2d 343, 351, 558 N.W.2d 653 (Ct. App. 1996).

III. THE MAJORITY'S FAILED ANALYSIS

¶55 With these statutes, and their purpose of ensuring financial recovery for innocent domestic abuse victims, in mind, I turn to the majority's analysis. The majority incorrectly concludes that "the record lacks any evidence showing Ydbi's arson constituted 'domestic abuse' against Ismet, as statutorily defined." Majority op., ¶3. In reaching this conclusion, the

8

majority creates four new hurdles for Ismet and other domestic violence victims seeking recovery under their insurance policies for property destroyed by their abusers. According to the majority's analysis, in order to establish domestic abuse, a victim must:

1. Show actual fear for his or her safety. Majority op., ¶¶34-35;

2. Disclose past or ongoing instances of physical or sexual abuse. Id., ¶35;

3. Prove the motive of his or her abuser. Id., ¶34;

4. Be present at the scene of the crime when the crime occurs. Id.

I address each new requirement in turn.

¶56 The majority creates its first hurdle for victims by determining that a domestic violence victim must show actual fear in order to establish domestic abuse. According to the majority, Ismet fails to "identify any evidence in the record establishing that she 'reasonably . . . fear[ed] imminent engagement' in the sort of bodily harm described in [Wis. Stat. § 968.075]." Majority op., ¶34. The majority asserts that a domestic violence victim must present evidence to demonstrate that she actually feared imminent engagement of bodily harm. Section 968.075(1)(a)4. plainly does not require a victim to so prove. It is important to repeat, and dispositive here, that in using the language "may cause the other person reasonably to fear," the legislature wrote the statute with an objective standard. The use of the word "may" indicates that the act must be of a kind that the result of reasonable fear is possible; it does not require that fear to be

9

realized, much less proven. In addition, "imminent" means forthcoming or threatening. So the question is, "Might [or may] arson cause a person in Ismet's position to reasonably fear harm was forthcoming?"

¶57 What matters here is whether the arson was an act that could have caused Ismet to reasonably experience fear. The focus of this statutory text is the nature of the abuser's arson, not the victim's actual response subsequent to that act. To hold otherwise is to create two classes of innocent insured domestic-abuse victims: those whose abusers were, in fact, successful at terrorizing their victims, who may recover; and those whose abusers' violent or destructive acts may not have yielded some factual indicia of their victims' fear, who are denied recovery. Had the legislature wanted to limit recovery solely to innocent insureds whose abusers actually caused fear, it certainly could have done so. State v. Shirley E., 2006 WI 129, ¶44, 298 Wis. 2d 1, 724 N.W.2d 623; see also United America, LLC v. Wisconsin Dept. of Transp., 2021 WI 44, ¶31, ___Wis. 2d ___, ___N.W.2d ___(Rebecca Grassl Bradley, J., dissenting) ("Had the legislature wanted to limit the meaning of "damages" solely to 'structural damages,' . . . it certainly could have.").

¶58 When we apply the correct objective standard to this case, it is clear that there is enough in the record for the question of whether the arson may have caused a person in Ismet's position to reasonably fear imminent harm to go before a jury. The record shows that in 1989, Ydbi was convicted of sexual assault and stalking. As a result of these convictions, a judge sentenced

10

him to prison and ordered him to register as a sex offender. These facts alone "may cause a person to reasonably fear imminent harm." Certainly the State was concerned about Ydbi's conduct; the judge sentenced him to prison and ordered him to comply with the sex-offender registry. And the record indicates that because of Ydbi's violent criminal history, Ismet sought a divorce——but for religious reasons, she obtained a legal separation instead——in an attempt to begin extricating her life from Ydbi's. The record further establishes that Ydbi continued engaging in criminal conduct when he burned down Ismet's house, destroying not only her home but all the belongings, keepsakes, and memories inside. In summary, the arson combined with Ydbi's past criminal record is more than enough evidence for the question of whether a reasonable person in Ismet's position would reasonably fear imminent harm to go to a jury.

¶59 The majority places a second hurdle in front of domestic violence victims by requiring an averment about "any past or ongoing instances of physical or sexual abuse by [an abuser]." Majority op., ¶35. As noted above, Wis. Stat. § 968.075(1)(a)4. does not require a subjective assessment. In this instance, Ismet does not have to aver instances of physical or sexual abuse because the statute is satisfied once she establishes that Ydbi's actions may cause a person in her position to reasonably fear imminent harm.

¶60 Additionally, forcing victims to disclose violence only perpetuates the isolation, shame, and fear many domestic violence victims experience. Often, victims are reluctant to share their

11

experiences of abuse even with those closest to them. See Sarah M. Buel, Fifty Obstacles to Leaving, A.K.A., Why Abuse Victims Stay, 28 Colo. Law. 19 (1999) ("Shame and embarrassment about the abuse may prevent the victim from disclosing it or may cause her to deny that any problem exists when questioned by well-intentioned friends, family, co-workers, or professionals.").

¶61 The majority's third hurdle for domestic violence victims is the new requirement that they must prove the motive of their abusers. The majority asserts that Ismet did not establish that she was the victim of domestic abuse because she failed to show that there was "evidence that Ydbi started the fire to harm Ismet." Majority op., ¶34. This is an inexplicable requirement for two reasons. First, the majority fails to cite any legal basis for the proposition that a victim must prove the motive of her abuser. Second, the majority sets for Ismet the impossible task of proving by direct evidence what was in Ydbi's mind.

¶62 The final hurdle which the majority sets for domestic violence victims is the requirement that a domestic violence victim must be physically present at the scene of the crime when it occurs in order to establish domestic abuse. The majority concludes that Ismet was not a domestic violence victim because she was in North Macedonia, rather than Oconomowoc, when Ydbi committed the arson. Id. According to the majority's flawed reasoning, victims cannot reasonably fear imminent harm if they are not in close proximity to the crime scene at the time the crime occurs.

¶63 As explained above, Wis. Stat. § 968.075(1)(a)4. does not require actual bodily harm or that the victim actually be

physically present at the crime scene. Additionally, the majority conflates the words "imminent" and "immediate" despite the terms having different meanings. As discussed above, the word "imminent" means "threatening to occur immediately; dangerously impending." This meaning is consistent with the legislature's use of the word "may" in the statute; the requisite act is one that carries with it the possibility of future abuse. The majority fails to explain how geographical distance means someone might not reasonably fear imminent harm.[5]

¶64 In conclusion, the majority creates new hurdles for domestic violence victims. It requires that a victim must: show her fear; disclose past or ongoing instances of physical or sexual abuse; prove her abuser's motive; and be physically present when the crime against her is committed. The majority places formalistic requirements on the actions and behavior of domestic abuse victims in the wake of their abuse that have no basis in the language of Wis. Stat. § 968.075(1)(a). And in doing so, it concludes that because Ismet: (1) did not say, "I am afraid;" (2) did not state, "I am the victim of physical or sexual abuse;" (3)

---

[5] At what point Ismet learned that Ydbi committed the arson, and whether it may have been reasonable for her to fear Ydbi at that time, are determinations for a fact-finder.

13

did not prove Ydbi's motive; and (4) was not home when Ydbi set fire to her home, she must not be a victim at all.[6]

¶65 In erroneously and inexplicably concluding that the record lacks any evidence showing Ydbi's act constituted domestic abuse, and affirming the circuit court's grant of summary judgment to Kemper, the majority "implicitly imputes the guilt of the arsonist to the innocent insured." Hedtcke, 109 Wis. 2d at 488.

¶66 For the foregoing reasons, I must dissent.

¶67 I am authorized to state that Justices ANN WALSH BRADLEY and REBECCA FRANK DALLET join this dissent.

---

[6] What if, instead of viewing people who've been abused as weak, we began to celebrate the strength it takes to persevere while overcoming the harm that was placed on them by someone who was supposed to love and care for them? What if, instead of accepting the myth that there's something wrong with people who were abused, we place full responsibility and accountability for the abuse on the people who perpetrate it?

Christine E. Murray, Triumph over Abuse: Healing, Recovery, and Purpose after an Abusive Relationship (2020).

14